UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

ALFONSO MANUEL BLAKE,

Petitioner,

v.

WILLIAM GITTERE,[1] et al.,

Respondents.

Case No. 3:09-cv-00327-RCJ-WGC

ORDER

Before the court for a decision on the merits is an application for a writ of habeas corpus filed by Alfonso Manuel Blake, a Nevada prisoner sentenced to death.  ECF No. 124.

I.  FACTUAL AND PROCEDURAL BACKGROUND

In March 2004, a jury sitting in the Clark County Eighth Judicial District Court found Blake guilty of two counts of first-degree murder with the use of a deadly weapon and one count of attempted murder with use of a deadly weapon. In the penalty phase of Blake's trial, the jury found the following aggravating circumstances for both murders: (1) Blake had been convicted of a felony involving the use or threat of violence to the person of another; (2) the murder was committed to avoid or prevent a lawful arrest; and (3) Blake had been convicted of more than one offense of murder in the immediate proceeding. The jury also found three mitigating circumstances: Blake's remorse; his mental, emotional, or physical state at the time of the

---

[1] William Gittere is automatically substituted for Timothy Filson as the Warden of Ely State Prison. See Fed. R. Civ. P. 25(d).

incident; and no evidence of a long-standing plan to commit murder. However, the jury determined that any mitigating circumstances were insufficient to outweigh the aggravating circumstances and returned a sentence of death. For the attempted murder with the use of a deadly weapon, Blake was sentenced to two consecutive terms of 96 to 240 months in prison.

In its opinion deciding Blake's direct appeal, the Nevada Supreme Court recounted the facts of the case as follows:

> In November 2002, Kim Choy moved to Las Vegas and began dancing at various clubs in town to earn money for school. Eventually, her younger sister, Sophear Choy, joined her and worked as a cocktail waitress and later danced at local clubs. While dancing at one club, Sophear befriended Priscilla Van Dine, also known as Sheila. Also through her employment, Sophear met Blake.
>
> In late February or early March 2003, Kim, Sophear, and Sheila met Blake at a bar. During the course of the evening, Blake told Kim that he had a house and would be willing to rent three rooms to her, Sophear, and Sheila. He told Kim that he did not live at the house but that three other women did. Regarding the rental arrangement, Blake informed Kim that each of the women would pay $500 per month and he would pay for health insurance and a gym membership. Kim told Blake that she would think about it. She and Blake agreed that in the meantime she, Sophear, and Sheila would store some of their belongings in Blake's garage.
>
> About two days later, Kim, Sophear, and Sheila dropped off their belongings at Blake's house. However, feeling uncomfortable with the arrangement the women decided not to move in. On March 3, 2003, Kim called Blake and informed him of their decision and thanked him for allowing them to store their belongings in his garage. Blake was upset by this news. Kim arranged to go over and retrieve their belongings the next night, around 11 p.m. On March 4, 2003, Kim, Sheila, and two of their friends drove to Blake's house in two vehicles, and without much incident they loaded their vehicles. Unable to load everything, Kim told Blake that they would return for the remainder of their belongings that evening.
>
> Sophear and Sheila accompanied Kim on the second trip. During the trip, Sophear had a phone conversation with Blake. Kim heard Blake screaming and Sophear telling Blake not to put their belongings on the street corner. When the women reached Blake's neighborhood, they noticed some of their possessions on a street corner. The women began loading their Denali SUV. Two cars soon pulled up behind the Denali. Blake rushed out of one of the vehicles and nudged Sophear in the back. Blake's companions, Jinah Chung, Bonette Lim, and Aileen Ramos, surrounded Sophear. Nervous that Sophear was about to be beaten, Kim called 9–1–1 on her cell phone. Kim told the 9–1–1 operator that her sister was getting beat up at the corner of Decatur and Lone Grove. Whenever Blake or his accomplices looked at her, Kim pretended that she was on the phone with a girlfriend.
>
> Blake began choking Sophear and hitting her head against boxes that had been loaded into the Denali. She unsuccessfully attempted to flee. Kim saw Sophear drop to the ground, and then she felt someone try to knock the phone out of her hand. When Kim turned around, Lim tried to hit her and grab the phone.

Next, Blake approached, snatched the phone from Kim, and demanded to know to whom she was speaking.

Sophear, still slouched over, asked Kim to help her walk. Blake told Kim that "we all need to calm down" and that "we're going to take a walk and just calm down." Confused, Kim asked Sophear what was wrong. Sophear said that she could not walk or breathe. Blake ordered Kim to help Sophear walk. As Blake, Kim, Sophear, and Sheila walked toward an open desert area, Blake ordered Chung, Lim, and Ramos to leave the area.

After walking some distance, Blake told Kim, "Look what [Sophear] made me do, she made me fucking stab her." Blake then pushed Kim and Sophear together and said, "Okay, that's far enough." He grabbed Sheila's sweater, threw her down on the ground, and told the women to get on their hands and knees. Blake donned a pair of gloves, pulled a silver revolver out of his pocket, and said, "I warned you I didn't want any problems." He shot Sheila and then Sophear in the head. Blake pointed the gun at Kim, who waved her hand over her head and screamed. Blake shot, and the bullet ricocheted off a ring on Kim's right hand and hit her in the head. Blake shot Kim again in the head, and she lost consciousness.

When Kim woke up, Blake was gone. Kim stumbled across the desert area yelling for help. She came to a police car and told the officer that she, her sister, and a friend had been shot by Slinky (Blake's stage name). One of the officers ran to the area from which Kim emerged and found Sophear dead. However, Sheila was still breathing. Paramedics transported Sheila to the University Medical Center Trauma Center, where she succumbed to her injuries a few hours later.

Meanwhile, Blake, although suffering from a stab wound, fled to Los Angeles with Chung, Lim, and his friend Vandal, in Chung's Blazer. During the drive, Blake and Vandal discussed Blake's alibi. Eventually the two concocted a story that Blake and Lim had been kidnapped and dumped in the desert and that Chung picked them up. Blake communicated the story to Ramos, who remained in Las Vegas. When they arrived in Los Angeles, Vandal wrapped Blake's gun in a towel and threw it in the sewer. They also stopped to buy hand cleaner. Blake scrubbed his hands with it and tossed the remainder down the sewer.

Eventually, Blake sought medical treatment for his injuries at a local hospital. He told personnel that his name was Marcus Edwards and that he had been mugged and stabbed. While at the hospital, Blake told a police officer that he was living with a friend in Los Angeles and had been stabbed outside a club in Hollywood.

Blake received a phone call at the hospital. Chung heard him say, "How could this be, there's no possible way. I shot them in the head." Blake left the hospital the day after checking in. He, Lim, and Chung drove to the San Bernardino, California, area and then headed back to Las Vegas. At approximately 4 a.m. on March 8, 2003, police officers in Barstow, California, who were on the lookout for Chung's Blazer, pulled the vehicle over with weapons drawn. Blake, Lim, and Chung were arrested without incident.

Dr. Gary Telgenhoff, a forensic pathologist with the Clark County Coroner's Office, performed autopsies on Sheila and Sophear. The autopsies revealed that both women had sustained gunshot wounds to the head. Additionally, there were a number of sharp force cuts and stabs on Sophear's left shoulder and back, behind her right ear, above her right breast, near her armpit, and on her right arm and hand. The cuts on her hands were consistent with

defensive wounds. Dr. Telgenhoff concluded that the cause of the deaths of both women was gunshot wounds to the head and that the manner of death was homicide.

Blake called Arlene Oliver, his sister, to testify in his defense. Oliver stated that Blake appeared at her home around 3 a.m. on March 5, 2003. She testified that Blake appeared irrational and delusional. Blake told Oliver that he needed a ride. When he got into Oliver's car, he hid and appeared afraid, as if someone was after him. Oliver testified that she dropped off Blake in a parking lot on Valley View Road.

Dr. Mortillaro, a psychologist, also testified in Blake's defense. Dr. Mortillaro stated that he had administered a series of tests and spent several hours interviewing Blake. He also interviewed Oliver, Blake's brother, Anthony Fleming, and Ramos. Dr. Mortillaro opined that Blake appeared to have a compromised mental state at the time of the killings, meaning that "he would have difficulty determining right from wrong and thinking logically." He further testified that Blake exhibited elements of antisocial and histrionic behavior and narcissism. Dr. Mortillaro testified that, based on his interviews, when the killings occurred Blake exhibited characteristics of a brief psychotic disorder in which he was confused, delusional, and disconnected from reality and exercised poor judgment. Dr. Mortillaro also opined that Blake suffered from post-traumatic stress disorder (PTSD) resulting from the stab wounds he received.

On cross-examination, Dr. Mortillaro stated that his reconstruction of Blake's mental state on March 5, 2003, was not dependent upon the tests he administered but upon the accuracy of the information Oliver, Fleming, and Ramos provided. He acknowledged that the three told him that Blake was not violent and that Ramos told him that the shootings were out of character for Blake. However, Dr. Mortillaro acknowledged that he was unaware of a number of prior violent episodes involving Blake.

In rebuttal, the State's expert psychiatrist, Dr. Thomas Bittker, disagreed with Dr. Mortillaro's diagnosis that Blake suffered a brief reactive psychosis and stated that Dr. Mortillaro's opinion did not correspond to any professional standard or to Dr. Bittker's clinical experience. Dr. Bittker also testified that Blake's PTSD resulted from the homicides themselves and not from being stabbed. Dr. Bittker concluded based upon a reasonable degree of medical certainty that Blake understood the nature of his actions during the early morning hours of March 5, 2003.

*Blake v. State*, 121 P.3d 567, 570–73 (Nev. 2005).

The Nevada Supreme Court affirmed Blake's convictions and sentences on direct appeal. Blake initiated state post-conviction proceedings on June 22, 2006. In May 2007, with the assistance of appointed counsel, he filed a supplemental petition. Without holding an evidentiary hearing, the state district court denied relief with a decision entered in October 2007. Blake appealed. In February 2009, the Nevada Supreme Court affirmed the lower court. *Blake v. State*, No. 50552, 2009 WL 1491366 (Supreme Court of Nevada, February 18, 2009).

On June 24, 2009, Blake initiated this federal habeas proceeding. On March 4, 2010, he

4

1  filed an amended petition for writ of habeas corpus. The following month, he initiated a second

2  state postconviction proceeding. On November 2, 2010, this court denied Blake's motion for stay

3  and abeyance and granted, in part, respondents' motion to dismiss his petition on exhaustion

4  grounds. When Blake refused to abandon unexhausted claims, this court dismissed this case

5  without prejudice pursuant to *Rose v. Lundy*, 455 U.S. 509 (1982).

6       On September 26, 2011, the state district court dismissed Blake's second state

7  postconviction petition as procedurally barred. On March 14, 2014, the Ninth Circuit Court of

8  Appeals reversed this court's dismissal of Blake's federal petition and remanded this case with

9  instructions to grant the stay and abeyance. *Blake v. Baker*, 745 F.3d 977 (9th Cir. 2014).

10      On July 30, 2014, the Nevada Supreme Court affirmed the lower court's dismissal of

11  Blake's second state petition. On October 29, 2014, Blake filed a status report in this case

12  indicating that his state court proceedings had concluded. On July 8, 2015, Blake filed a second

13  amended petition for writ of habeas corpus. On November 9, 2015, respondents moved to

14  dismiss, arguing that claims in the petition were unexhausted, procedurally barred, and/or not

15  cognizable in a federal habeas proceeding.

16      In an order entered September 28, 2016, the court dismissed, as procedurally defaulted,

17  Claims Six(A,B,D, and E), Seven(B, C, D1.2, D2, F, H, I, K), Nine (except Nine(A)(ii) and

18  Nine(F)), Ten, Eleven, and Thirteen. Claims Two(A), Three, Five(G), Seven(A, D1.1, D1.3, E,

19  J), Nine(F), and Twelve(A) were partially dismissed as procedurally defaulted. In addition, the

20  court concluded that the ineffective assistance of counsel (IAC) claims in One, Two(B-F), Four,

21  Five(A-F, H-J), Nine(A)(ii), and Twelve(B) are also procedurally defaulted, but reserved

22  judgment as to whether Blake could demonstrate cause and prejudice to overcome the default of

23  those claims.

24      The court now addresses the merits of Blake's remaining claims.

25  II.  STANDARDS OF REVIEW

26      This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).

27  28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

28          An application for a writ of habeas corpus on behalf of a person in custody

pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409.  "[A] federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings,

1   which demands that state-court decisions be given the benefit of the doubt") (internal quotation

2   marks and citations omitted).

3        "[A] federal court may not second-guess a state court's fact-finding process unless, after

4   review of the state-court record, it determines that the state court was not merely wrong, but

5   actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004); *see also Miller-El*,

6   537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual

7   determination will not be overturned on factual grounds unless objectively unreasonable in light

8   of the evidence presented in the state-court proceeding, § 2254(d)(2).").  Because *de novo* review

9   is more favorable to the petitioner, federal courts can deny writs of habeas corpus under § 2254

10  by engaging in *de novo* review rather than applying the deferential AEDPA standard.  *Berghuis*

11  *v. Thompkins*, 560 U.S. 370, 390 (2010).

12       III.  ANALYSIS OF CLAIMS

13       **Claims One through Five -- Ineffective Assistance of Counsel (IAC) Claims**

14       In Claims One through Five, Blake raises claims that he received ineffective assistance of

15  counsel (IAC) in violation of his constitutional rights. To demonstrate ineffective assistance of

16  counsel in violation of the Sixth and Fourteenth Amendments, a convicted defendant must show

17  1) that counsel's representation fell below an objective standard of reasonableness under

18  prevailing professional norms in light of all the circumstances of the particular case; and 2) that it

19  is reasonably probable that, but for counsel's errors or omissions, the result of the proceeding

20  would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984).

21              *Claim One*

22       Claim One is, in essence, a cumulative error claim premised on alleged ineffectiveness of

23  counsel throughout the entirety of trial counsel's representation. In pleading Claim One, Blake

24  incorporates by reference the IAC claims contained throughout his petition. All of the IAC

25  claims that are properly before the court are addressed below. The court concludes that none of

26  them warrant habeas relief. Blake has failed to demonstrate that the cumulative effect of

27  counsel's alleged deficiencies rendered the result of his trial unreliable. *See Strickland*, 466 U.S.

28  at 694. Thus, Ground One is denied.

*Claim Two(A)*

In Claim Two(A), Blake claims his trial counsel was ineffective in hiring and failing to adequately prepare the mental health expert, Louis Mortillaro, Ph.D., who testified for the defense. He contends that counsel's failure to conduct an adequate investigation of his (Blake's) background meant that Dr. Mortillaro was unable to fully assess his psychological condition. Blake further alleges that Dr. Mortillaro did not perform neuropsychological testing that would have revealed that Blake suffers from organic brain damage, Tourette syndrome, and fetal alcohol spectrum disorders (FASD). Blake also claims that counsel's failure to ensure the Dr. Mortillaro understood the insanity defense resulted in Dr. Mortillaro inaccurately concluding that Blake was insane at the time of the offense. In addition, Blake alleges that counsel's failure to prepare Dr. Mortillaro for his testimony with information about Blake's background and history of violence resulted in Dr. Mortillaro being forced to acknowledge on cross-examination that he had received incomplete information about Blake and that his conclusions about Blake's mental state during the offense were, therefore, invalid. Blake further alleges that counsel was ineffective for failing to lodge proper objections during the cross-examination and failing to request a limiting instruction informing the jury that the State's questions were not considered substantive evidence.

On direct examination, Dr. Mortillaro testified that he formed this opinion based upon seven to eight hours of testing and interviewing Blake, and interviews with Blake's sister (Arlene Oliver), brother (Anthony Fleming), and girlfriend (Aileen Ramos). ECF No. 41-10 at 19. Based on those tests and interviews, he determined that Blake suffered from identifiable personality disorders, including borderline personality disorder, that made him prone to brief psychotic episodes. ECF No. 41-10 at 20. His opinion was that Blake experienced such an episode at the time of the offense that was triggered by his altercation with Sophear, during which he suffered three stab wounds that required medical attention. *Id*. He testified that Blake could not appreciate the wrongfulness of his acts due to his delusional state. ECF No. 41-11 at 2. He qualified his opinion by stating that "if he's lying to me or other people are lying to me, as I put in my report, I reserve the right to render another opinion." *Id*.

8

On cross-examination, the prosecutor seized on this disclaimer by first establishing that the people Dr. Mortillaro interviewed had told him that Blake was not a violent person and did not have the character to injure another person. ECF No. 41-11 at 4-5. The state then conducted the following cross-examination of Dr. Mortillaro:

Q.  Were you aware that back in 1988 the defendant hit another young man with a baseball bat and broke his nose?

[BLAKE'S COUNSEL]:  Move to object for the record, your honor. We had this discussion.

THE COURT:  Objection is noted but overruled.

Q.  Were you told that?

A.  I don't recall. I looked at a record, but I don't recall that particular event.

Q.  Again in 1988, a young woman named Valerie Duvall. She was driving her car down Eastern Avenue here, got into an argument with the defendant in another car, and at an intersection the defendant got out of his car, punched Valerie twice in the face. Were you aware of that?

A.  No.

. . .

Q. 1989 were you aware that the defendant after agreeing to fight another young man stabbed the man twice?

A.  I wasn't told that, no.

[BLAKE'S COUNSEL]: Judge, I believe the prosecution is making allegations that are not borne out by judgments of conviction or the like.

THE COURT:  Well, you have the right to cross-examine.

[BLAKE'S COUNSEL]:  Okay, Judge.

. . .

Q. Again, Doctor, 1992 were you aware that the defendant went to his ex-girlfriend's car, pulled a gas line off the carburetor and laid a live wire next to that gas line? Were you told that?

A. No.

Q. 1992 were you aware that the defendant threatened to kill a young man named Reginald Harris with a knife?

A. Wasn't told that either, no.

Q. Again, 1992 were you aware of an incident involving his ex-girlfriend Melanie

1        Flowers where the defendant punched her in the face at the Meadows Mall and threw her down on the ground and continued to beat her?

2        A. I wasn't told that either.

3  *Id*. at 5.

4        The next day, before taking additional testimony, the trial court gave the jury the

5  following admonition:

6        Yesterday afternoon during the cross-examination of Dr. Mortillaro, the
State discussed with the doctor whether the doctor was aware of certain things

7        that they believe occurred many years ago. You are to disregard the questions—
the facts contained in the questions of [the prosecutor] from an evidentiary

8        standpoint in this case. In other words, it has nothing to do with this trial. Those
questions were simply asked to determine the background and knowledge of Dr.

9        Mortillaro in making his diagnosis.

10  ECF No. 41-13 at 4.

11        Blake presented an abbreviated version of Claim Two(A) in his first state habeas

12  proceeding. The Nevada Supreme Court found and held as follows:

13        Blake next argues that the district court erred by summarily denying his
claim that trial counsel were ineffective for failing to prepare Dr. Louis Mortillaro

14        for trial by informing him of Blake's violent history. However, Dr. Mortillaro
testified that his assessment of Blake's mental state was based in large part on

15        representations of Blake's family members and one of the women who had been
with Blake when he confronted the victims, who all advised Dr. Mortillaro that

16        Blake was not a violent person. Therefore, the information upon which Dr.
Mortillaro relied to conclude that Blake suffered from a psychotic disorder at the

17        time of the shootings was supplied by Blake's own witnesses. Blake did not
suggest that counsel should have known how the persons Dr. Mortillaro

18        interviewed would characterize Blake's character. And even assuming counsel
were deficient, Blake cannot demonstrate prejudice. Given the manner in which

19        the shootings were accomplished and Blake's actions after the event, there is no
reasonable probability of a different outcome had Dr. Mortillaro known about

20        Blake's history of violence. Because Blake failed to demonstrate that counsel
were ineffective in this regard, we conclude that the district court did not err by

21        summarily denying this claim.

22  ECF No. 46-12 at 8.

23  When Blake attempted to present the version of Claim Two(A) that is currently before this court,

24  the Nevada Supreme Court dismissed the claim as procedurally barred and, alternatively, as

25  barred under the law-of-the-case doctrine. ECF No. 132-13. In doing so, the court noted that

26  Blake had failed to show that his counsel in his first state habeas proceeding was ineffective, in

27  part, because he could not demonstrate prejudice given "the overwhelming evidence showing

28  that he lined up the victims, forced them on their knees, and methodically shot each of them in

the back of the head and then fled Las Vegas, constructed an alibi, and concealed evidence." *Id*. at 13-14.

Blake argues that the deferential standard of review imposed by AEDPA does not apply because the Nevada Supreme Court did not adjudicate his current version of Claim Two(A) on the merits. Even under de novo review, however, Claim Two(A) does not warrant habeas relief.

On the deficient performance prong of the *Strickland* test, Blake has provided a declaration (executed in 2010) from his trial counsel, Peter Christiansen, in which Christiansen concedes that he made mistakes with respect to his retention and preparation of Dr. Mortillaro. ECF No. 125-7 at 172. Christiansen notes that he hired a separate expert to conduct a neuropsychological examination of Blake, but that expert was unable to complete testing or produce a report. *Id*. According to his declaration, Christiansen's "failure to hire another neuropsychologist was not strategic, but based on time and financial constraints, and the limited availability of local neuropsychologists." *Id*. Christiansen further notes that he hired Dr. Mortillaro "shortly prior to trial" with "the hope that he would be able to identify Mr. Blake's mental status at the time of the offense, as well as any long-term personality characteristics affecting his personal-social functioning." *Id*. Christiansen states that "Dr. Mortillaro did not request, and I did not provide, the tools necessary for him to make a competent diagnosis of Mr. Blake such as scholastic, criminal, and medical records and family history." *Id*. In addition, he concedes that neither he nor Dr. Mortillaro were aware that "Nevada case law had precluded an insanity defense based on the premise that the client was in fear of <u>future</u> harm as opposed to imminent danger." *Id*. (Emphasis in original.)

With the benefit of hindsight to assess how counsel *should* have defended him, Blake has demonstrated his trial counsel committed errors and omissions in preparing and presenting the testimony of Dr. Mortillaro. It cannot be said, however, that counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88. Christiansen attempted to support Blake's defense with neuropsychological testing, but he had limited time and resources at his disposal. *See Richter*, 562 U.S. at 107. And, while Christiansen blames himself for not providing more background information, Dr. Mortillaro spent several hours interviewing

1   Blake, Blake's sister (Arlene Oliver) and brother (Anthony Fleming), and Blake's girlfriend

2   (Aileen Ramos).[2]  With respect to allegedly failing to lodge proper objections during the cross-

3   examination, Blake argues that counsel should have emphasized that the prosecutor's questions

4   were based on unproven allegations, but based on the transcript excerpt above, objections

5   beyond the ones counsel lodged would not have changed the court's ruling because either the

6   grounds for the objection had already been discussed or the trial court was not receptive to

7   additional argument.  Likewise, he faults counsel for not promptly requesting a proper limiting

8   instruction, but does not demonstrate that the instruction quoted above, which the trial court

9   issued first thing the very next morning after Mortillaro's afternoon testimony, was insufficient.

10  As for Christiansen's failure to grasp the nuances of the insanity defense, that issue is addressed

11  below in relation to Claim Three.

12          Even if counsel's errors in relation to Dr. Mortillaro were "so serious that counsel was

13  not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" (*Strickland*,

14  466 U.S. at 687), Blake has not shown prejudice under *Strickland*. Blake contends that he was

15  prejudiced because counsel's failings caused Dr. Mortillaro to provide an inaccurate diagnosis to

16  the jury and to be discredited on cross-examination. According to Blake, there is a reasonable

17  probability that, had Christiansen properly prepared Dr. Mortillaro, the jury would not have

18  found that Blake had formed the intent and mental state necessary to be convicted of first-degree

19  murder. The court disagrees.

20          Certainly, with better preparation, Dr. Mortillaro could have been a more effective

21

22  [2] In his petition, Blake alleges that Fleming and Oliver "report that they never spoke with Dr.
    Mortillaro nor to any defense experts" and cites their declarations as support. ECF No. 124 at 39.
23  The court notes that Fleming's declaration states only that he "never met with Dr. Mortillaro" and
    has "no memory" of speaking with him. ECF No. 173-6 at 10. Oliver states that she is "certain that
24  [she] never spoke to Dr. Mortillaro" but appears to be relying on the fact that she did not recognize
    him when he testified at Blake's trial. ECF No. 22-4 at 10-11. Both declarations are dated February
25  2010, nearly six years after Blake's trial. Dr. Mortillaro's report indicates that he interviewed both
    siblings by telephone a few days prior to finishing his report. ECF No. 5-13 at 82-83. His report
26  also includes an account of the information they each provided. *Id*. at 91-92. He also testified at
    trial that he interviewed both of them. ECF No. 41-10 at 19. Based on this record, the court finds
27  that Dr. Mortillaro did interview Fleming and Oliver despite Blake's allegations suggesting
    otherwise.
28

witness. The State was able to effectively cross-examine him due to his lack of knowledge about Blake's background and history of violence. Also, he may not have been able to fully inform the jury about the breadth and magnitude of Blake's mental impairments. This court must determine, however, the likelihood that, but for counsel's errors, a reasonable juror would not have found Blake guilty of first-degree murder. In doing so, the court  "compare[s] the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Rogers v. Dzurenda*, 25 F.4th 1171, 1190 (9th Cir. 2022) (quoting *Hernandez v. Chappell*, 923 F.3d 544, 551 (9th Cir. 2019) (additional citation omitted).

The trial testimony of Dr. Mortillaro is recounted above. The State's expert psychiatrist, Dr. Bittker, testified at trial that he interviewed Blake for 90 minutes at the Clark County detention facility prior to testifying. ECF No. 41-13 at 7. He opined as follows:

> The Defendant reports intrusive images dating from the time of the homicides. He has nightmares reflective of that same incident or incidents. He has periods of hyperarousal that at times he's extremely anxious and he's troubled by the images and does all he can to block them out. In spite of his efforts to block them out, they still penetrate his awareness.
>
> To be very clear, the Post Traumatic Stress Disorder sprung from the homicides themselves. They did not spring from our antecedent event.

*Id*. To support his conclusion that Blake's PTSD arose from the homicides rather than being stabbed, he noted that Blake had reported to him that he had been involved in several fights and had, on one occasion, been shot, but "did not report any post trauma intrusive imagery or nightmares after having been shot." *Id*. at 8. In his testimony, Bittker disagreed with the notion that Blake could have suffered a psychotic break that lasted only 20 minutes or an hour, noting that such an event "is extended over at least a day and in most cases several days." *Id*. He testified that the evidence did not support a finding that Blake did not understand the nature of his actions. *Id*. at 9. When asked what facts supported that conclusion, he testified as follows:

> Well, this is based on corroborating evidence at least as in supported by one of the witnesses, the surviving witness, I believe Ms. Kim. According to that witness, the Defendant escorted the victims to the desert where the bodies and the crime would not be recovered.
>
> He lied to the hospital personnel which would indicate he was trying to cover something up. He sought to escape the scene of the crime and attempted to

13

1   assume a different identity. Beyond that, we have corroborating evidence beyond
    that provided by Kim and that is a number of phone calls that he made to Bonette
2   in the immediate timeframe right after the incident in question.

3       …

4       That's consistent with a pattern of somebody that committed a crime and
    attempted to escape avoidance which occurred almost instantaneously following
5   the crime question. The other thing I would point out if this were simply a
    reaction to an assault it would be an instantaneous reaction. What is most
6   compelling there is that there is a significant time period, up to five minutes,
    between the struggle occurred that's involving the knife wounds on the part of
7   both parties, principal parties and when the gunshots to the three of the victims
    occurred.

8       In addition to that, there is reports and supported by physical evidence,
    because there were two crime scenes, there is evidence to indicate that the
9   Defendant escorted the victims to the desert where they would be less likely to be
    detected, that also would reflect some premeditation and some awareness of what
10  he was trying to do was commit a crime that ultimately would be hidden.

11  *Id*.

12      To demonstrate the evidence that might have been presented, Blake has provided a

13  neuropsychological and psychological evaluation report compiled by Jonathan H. Mack, Psy.D.,

14  a neuropsychologist (ECF No. 22), and a report prepared by James R. High, M.D. According to

15  his report, Dr. Mack conducted a two-and-a-half-hour clinical interview with Blake and a

16  lengthy neuropsychological and psychological evaluation that included "a battery of

17  neuropsychological tests." *Id*. at 2-3. He also reviewed school records, police reports, court

18  records, a social history, and the evaluations prepared by Dr. Bittker and Dr. Mortillaro. *Id* at 3-

19  16. He diagnosed Blake with "the well know known comorbid triad of Attention Deficit

20  Hyperactivity Disorder, Tourette's Disorder, and Obsessive Compulsive Disorder." *Id*. at 37.

21  Mack also noted "clear evidence that Mr. Blake had both chronic and relatively acute

22  Posttraumatic Stress Disorder at the time of the homicides." *Id*. In addition, according to Mack,

23  "neuropsychological test results reveal that Mr. Blake has definite neuropsychological evidence

24  of brain damage." *Id*. He characterized the brain damage as "being mild to moderate in severity

25  and most likely neurodevelopmental in origin." *Id*.

26      Some of Dr. Mack's conclusions are as follows:

27      It is this examiner's opinion, as stated within a reasonable degree of
    neuropsychological and psychological scientific certainty, that Mr. Blake had
28  numerous neuropsychiatric and psychiatric conditions at the time of the homicides

14

that were clearly relevant in terms of causing Mr. Blake to be unable to conform his behavior to the requirements of the law, the one hand, while also placing him in a state of extreme mental and emotional disturbance, on the other. Disorders that were, in this examiner's opinion, existent at the time of the homicides, that were not raised by his defense team at trial include: Tourette's Disorder; Dementia/Chronic Brain Damage; Organic Personality Syndrome/Personality Change due to Brain Damage; Panic Disorder; and Obsessive Compulsive Disorder.

Mr. Blake's extreme mental and emotional disturbance at the time of the homicides was an outgrowth of the extremely toxic environment in which he was raised, the fact that the victim's triggered "hot buttons" for him that caused to go [sic] into a dissociated state related to his history of past trauma and abuse/Post Traumatic Stress Disorder…. This appeared to cause in him an uncontrolled rage reaction similar to what was reported by his sister Norma in the past.

It is this examiner's further opinion that Mr. Blake was in such a brain damaged and dissociated state at the time of the homicides that he was unable to deliberate and/or formulate the intent to kill his victims, as stated within a reasonable degree of neuropsychological and psychological scientific certainty.

*Id*. at 40-41.

Dr. High, according to his report, spent four and a half hours conducting a psychiatric diagnostic interview with Blake. ECF No. 125-7 at 95. He also reviewed medical records and documents relevant to Blake's mental state and consulted with Dr. Mack and incorporated his findings into his report. *Id*. at 96-98. In addition, he interviewed a good friend of Blake's from his teenage years to adulthood, Terrell Edwards, and Blake's former girlfriend, Melanie Flowers. *Id*. at 99

Some of Dr. High's conclusions are as follows:

Alfonso Blake suffers from severe lifelong psychiatric impairment known as Dissociative Disorder NOS. This Disorder was strongly in evidence according to witnesses and documents in his childhood, in his adulthood, at the immediate time of the murders, during his evaluation with Dr. Bittker, at the time of trial, and currently.

Blake's Dissociative Disorder manifests primarily through three symptom clusters: dissociative amnesia; separate, distinct, unintegrated and rapidly changing mental states; and significant physical numbing analgesia.

There is significant evidence that all three symptoms were present in childhood, extending into his adulthood, and at the time of the crime. There is clear and ample evidence that at the time of trial Blake was in a dissociative state that was undetected by Dr. Bittker and barely mentioned by Dr. Mortillaro. He was not only shockingly amnestic for vast autobiographical information concerning childhood trauma, he was actually demonstrating pathological dissociative functioning of his mind right in front of Dr. Bittker, but the doctor apparently lacked the expertise to recognize it . . . . numerous times Blake, in describing his recollection of events, told the doctor he suddenly "noticed"

himself, e.g. "I noticed" a gun, that "I was limping," "myself in a lot of pain." This is how a highly dissociative person describes the experience of a divided self. Normal people say, "I had a gun," or "I was limping" or "I was in pain." This is a vital mental status finding, as important as noticing a paranoid delusion, which Dr. Bittker missed.

As a result of his severe pre-existing dissociative amnesia difficulties, Mr. Blake was incapable himself of providing counsel or Dr. Bittker or Dr. Mortillaro with an accurate accounting of his childhood and its impact on his capacity to maintain consciousness, memory, and identity. Thus, due to his illness and due to the failures the psychiatrist and psychologist [sic] at the time of examination and trial, this information, certainly important to deliberations of penalty but perhaps also to questions of the willfulness of his acts, was never presented to the jury. Mr. Blake simply blocked out the pain of his childhood so that when Dr. Bittker asked him directly if he was hit, he could say, "No," when "Yes" might have opened the door to further inquiry.

The presence and intensity of these three factors, amnesia, triggered switching into distinct states of mind and mood and physical numbing are all out of his conscious control and are rather responsive to environmental stresses, particularly if they are traumatic. It appears to a reasonable medical certainty that the escalating argument with [victim] Sophear began a rapid process in which her stabbing of him clearly triggered further dissociation, resulting in him in the words of [former girlfriend] Ms. Flowers "going away" into a new state of mind in which he committed the murders and for which he has no memory. This was absolutely and certainly not the first time this had happened to him, disastrous though its outcome. Ms. Flowers was able to describe the relative futility of rationalizing or arguing with him when he was in such a state in the past. Thus, in such a state, his capacity to deliberate his actions, choices and decisions was more likely than not significantly impaired by the triggering of his dissociative illness.

It appears that the murders must have been committed within a six minute window between Miss Choy's call to 911 at 2:02 a.m. and Mr. Blake's call at 2:08 a.m. Allowing time for Blake to be stabbed and struggle with Sophear and then walk away after shooting, the time is probably less. Given that dissociative fugue states can last for months and given Ms. Flower's description of similar prior dissociative episodes it is certainly possible, and more likely than not, that shortly before, during, and for a time after the crime he was in a dissociative state. During such a state a primitive pre-rational part of him would be acting, unmodified by adult reason, deliberation, and contemplation.

*Id*. at 167-69.

Having considered the reports of Dr. Mack and Dr. High, this court finds less than a reasonable likelihood that a reasonable juror would not have found Blake guilty of first-degree murder if counsel had presented their testimony at trial. Their reports fail to adequately account for Blake's actions before, during, and after the homicides, which demonstrate that he was capable of forming, and in fact formed, the specific intent to shoot and kill his victims. The facts recounted by the Nevada Supreme Court are not in dispute. After the altercation with Sophear, Blake directed his three victims to walk toward the open desert and ordered his companions to

16

leave the area. Having walked some distance, he told the three victims to get on their hands and knees. He put on gloves before pulling a gun out of his pocket. After telling them he had warned them that he did not want any problems, he shot each of them in the head. Based on trial testimony, he then fired three more shots, with one hitting Sophear in the head and one hitting Kim in the head. ECF No. 41 at 19; ECF No. 41-10 at 10-11.

Blake then fled to Los Angeles with Chung, Lim, and his friend Vandal. On the way to Los Angeles, Blake and Vandal devised the alibi about being kidnapped, which Blake then related to Ramos, who had remained in Las Vegas. When they arrived in Los Angeles, Vandal wrapped Blake's gun in a towel and threw it in the sewer. Blake also scrubbed his hands with hand cleaner he had purchased and tossed the remainder down the sewer. When subsequently seeking medical treatment for his stab wounds, Blake gave hospital personnel a fake name and told them he had been mugged.

This course of events makes it very unlikely that a reasonable juror would be convinced that Blake was in such a dissociated state at the time of the murders that he was unable to form the intent necessary to support first-degree murder. Dr. High and Dr. Mack both opined that Blake was misdiagnosed by Dr. Mortillaro and Dr. Bittker. They did not, however, adequately address Dr. Bittker's testimony that Blake's conduct demonstrated that he was aware of the nature of his actions and that his actions were premeditated. In sum, the evidence in the record regarding Blake's mental impairments, including the reports of Dr. High and Dr. Mack, do not establish a reasonable doubt that Blake murdered his victims willfully, deliberately, and with premeditation. Accordingly, the court concludes that there is no reasonable possibility of a different outcome had counsel acted differently with respect to his preparation and presentation of Dr. Mortillaro's testimony. *See Strickland*, 466 U.S. at 694.

Claim Two(A) is denied.

*Claim Two(B)*

In Claim Two(B), Blake alleges his trial counsel were ineffective in failing to investigate and retain the services of a neuropsychologist. To support this claim, he relies upon the report and conclusions of Dr. Mack, discussed above. He alleges that a neuropsychologist like Dr.

Mack would have had the training and expertise to make a more legally relevant assessment of Blake's mental impairments, as compared to Dr. Mortillaro. He notes that Dr. Mack's testing revealed neuropsychological evidence of brain damage and that Dr. Mack diagnosed numerous mental disorders that Dr. Mortillaro failed to recognize.  He also points to Dr. Mack's conclusion that Blake's PTSD pre-existed the homicides and stemmed from the toxic environment in which Blake was raised, which contradicts the State's theory at trial that it arose from the act of killing his victims.

According to Blake, a neuropsychologist like Dr. Mack would have provided evidence that Blake could not form the intent necessary to be guilty of first-degree murder and also evidence that would have mitigated Blake's guilt. For reasons discussed above in relation to Claim Two(A), the court rejects the former contention. For reasons discussed below in relation to Claim Four, the court also rejects the latter. Claim Two(B) is denied.

*Claim Two(C)*

In Claim Two(C), Blake alleges that his trial counsel were ineffective in failing to investigate and obtain the services of an expert on FASD. As evidentiary support for this claim, he has proffered the declaration of Natalie Novick-Brown, Ph.D., a professed expert on FASD. ECF No. 125-10, p. 121-35. According to the declaration, Blake's counsel provided Novick-Brown "with preliminary information and materials relevant to this matter on February 14, [2011]." *Id*. at 123. Based on that information, Novick-Brown "concluded that a diagnosis of an FASD condition is highly likely once Alfonso Blake undergoes medical assessment." *Id*. at 124. Later in the declaration, she states "there is abundant preliminary information in the few records reviewed for this declaration to support a conclusion that an FASD diagnosis is LIKELY." *Id*. at 130.

Blake does not claim, nor does the record indicate, that the "medical assessment" referred to in the declaration or any additional inquiry has ever been conducted. For the purposes *Strickland*, "[s]peculation about what an expert could have said is not enough to establish prejudice." *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997). Inconclusive new evidence that a petitioner may or may not suffer from some sort of cognitive dysfunction does not generally

1   establish an ineffective assistance of counsel claim. *See Smith v. Quarterman,* 515 F.3d 392, 405

2   (5th Cir. 2008). Thus, even taken at face value, Novick-Brown's declaration falls well short of

3   establishing a reasonable probability that the outcome of Blake's trial would have been different

4   if trial counsel had investigated FASD or obtained the services of an expert on FASD. Blake

5   cites to no other evidence to support his claim. Thus, Claim Two(C) is denied.

6               *Claim Two(D)*

7       In Claim Two(D), Blake alleges his trial counsel were ineffective in failing to obtain an

8   expert on Tourette syndrome. However, Blake has presented no evidence establishing what

9   specific testimony such an expert would have provided in Blake's case. *See Grisby*, 130 F.3d at

10  373. Claim Two(D) is denied.

11              *Claim Two(E)*

12      In Claim Two(E), Blake alleges his trial counsel was ineffective in failing to obtain the

13  services of a social scientist to explain the impact of his family history on his actions on the day

14  of the offense. However, Blake has presented no evidence establishing what specific testimony

15  such an expert would have provided in Blake's case. *See Grisby*, 130 F.3d at 373. Claim Two(E)

16  is denied.

17              *Claim Two(F)*

18      In Claim Two(F), Blake alleges his trial counsel was ineffective in failing to obtain an

19  institutionalization expert for the purposes of rebutting the State's evidence in aggravation. As

20  evidentiary support for this claim, he has proffered the declaration of Mark D. Cunningham,

21  Ph.D., a professed expert on future dangerousness, with a focus on the probability of violence by

22  capital offenders in prison. ECF No. 125-10 at 137-48. In his declaration, Cunningham identified

23  the following factors that "would be associated with a reduced risk of prison violence for Mr.

24  Blake relative to broader categories of inmates or capital offenders": (1) age, (2) continuing

25  contact with community members, (3) education, (4) employment, and (5) past correctional

26  behavior. *Id*. at 142-43. Blake claims that testimony from an expert like Cunningham "would

27  have convinced the jury that a life verdict was appropriate." ECF No. 124 at 54.

28      The hiring of expert witnesses and the presentation of their testimony is a matter of trial

strategy. *Harrington v. Richter*, 562 U.S. 86, 107 (2011). "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

In the penalty phase of Blake's trial, the State did not present evidence specifically intended to demonstrate his future dangerousness nor was future dangerousness an issue to be decided by the jury. Instead, Blake faults counsel for not presenting evidence to rebut the State's assertion in closing argument that the imposition of the death penalty would guarantee that Blake "never kills again." ECF No. 124 at 53. Under the circumstances, counsel's failure to retain a future dangerousness expert cannot be equated to representation that fell "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland*, 466 U.S. at 686.

In addition, given the brutal nature of Blake's crimes and his history of violence, there is not a reasonable probability that the jury in Blake's trial would not have imposed the death penalty if trial counsel had presented the information in Cunningham's declaration. *See Blake v. State*, 121 P.3d 567, 573 (Nev. 2005) (describing evidence presented in penalty phase of Blake's trial). Therefore, Claim Two(F) is denied.

*Claim Two(G)*

Claim Two(G), which alleges cumulative error and prejudice arising from counsel's allegedly deficient performance, is denied for the reasons discussed above in relation to Claim One.

*Claim Three*

In Claim Three, Blake alleges trial counsel were ineffective in directing him to enter a plea of not guilty by reason of insanity based upon their misapprehension of the elements of that defense. He contends that counsel failed to grasp the basic elements of not only the legal defense of insanity, but also the elements of their other two proffered affirmative defenses, mistake of fact and unconsciousness. According to Blake, this resulted in counsel failing to develop his only viable defense – i.e., that he was guilty of second-degree murder, not first-degree murder. Blake

20

contends that counsel failed to recognize that, based on the Nevada Supreme Court's decision in *Finger v. State*, 27 P.3d 66 (Nev. 2001), his intended insanity defense was not legally viable. He further alleges that counsel pursued the defense even after the trial court notified him of such. Blake also claims that counsel was ineffective by offering jury instructions concerning an insanity defense even though there was no evidence to support such a defense.

The Nevada Supreme Court in *Finger* clarified the requirements of an insanity defense as follows:

> To qualify as being legally insane, a defendant must be in a delusional state such that he cannot know or understand the nature and capacity of his act, or his delusion must be such that he cannot appreciate the wrongfulness of his act, that is, that the act is not authorized by law. So, if a jury believes he was suffering from a delusional state, and if the facts as he believed them to be in his delusional state would justify his actions, he is insane and entitled to acquittal. If, however, the delusional facts would not amount to a legal defense, then he is not insane. Persons suffering from a delusion that someone is shooting at them, so they shot back in self-defense are insane under *M'Naghten*. Persons who are paranoid and believe that the victim is going to get them some time in the future, so they hunt down the victim first, are not.

*Finger*, P.3d at 84–85. The court further explained that "[d]elusional beliefs can only be the grounds for legal insanity when the facts of the delusion, if true, would justify the commission of the criminal act." *Id*. at 85. Blake argues that counsel's theory of insanity at trial was not viable because it was premised entirely on the idea that Blake committed the offense because he was under a delusion that victim Sophear Choy's boyfriend had access to firearms and presented a future danger to Blake and his family. In addition, there was no evidence to support a finding that Blake believed himself to be in *immediate* danger, which is a requisite element of a valid self-defense claim.

In his declaration, Christiansen states that Dr. Mortillaro informed him a day or two before trial that he had concluded that Blake had a brief psychotic episode at the time of the offense "which negated his ability to premeditate, make logical decisions or be in full possession of his mental faculties" – in essence, that Blake "was not guilty of the offense by reason of insanity." ECF No. 125-7 at 172. As noted above, he also concedes that neither he nor Dr. Mortillaro were aware that "Nevada case law had precluded an insanity defense based on the premise that the client was in fear of <u>future</u> harm as opposed to imminent danger." *Id*. (Emphasis

in original.) Christiansen further states that he did not want to commit to the defense prior to trial

because Dr. Mortillaro's conclusions were contingent on the reliability of information provided

by Blake's sister, Arlene Oliver, brother, Anthony Fleming, and girlfriend, Aileen Ramos.

Instead, he wanted to see how the evidence developed during the trial before committing to the

defense and leave open the possibility of arguing a different defense if appropriate. However,

when the trial judge told him he would be precluded from arguing the defense unless he filed a

notice prior to trial fully committing to it, he filed the notice under objection rather than risk

forfeiting the defense. He states that had he known at the time that "Nevada law precluded an

insanity defense based on fear of future harm," he would not have pursued the defense and

"instead would have solely attacked the elements of premeditation and deliberation." *Id*.

 Blake presented Claim Three in his first state habeas proceeding. The Nevada Supreme

Court found and held as follows:

> Blake further contends that the district court erred by summarily denying
> his claim that trial counsel were ineffective for pursuing an insanity defense
> because the facts of his case did not support such a defense and insanity is an
> "extremely difficult [theory] to promote successfully to a jury." Blake suggests
> that counsel should have pursued theories of self-defense, diminished capacity, or
> an imperfect self-defense. This claim lacks merit for four reasons.
>
>  First and foremost, Blake presented nothing more than bare allegations.
> Therefore, on this basis alone, the district court did not err by summarily denying
> this claim. *Hargrove* [*v. State*, 100 Nev. 498, 502-03, 686 P.2d 222, 225 (1984)].
>
>  Second, pursuing an insanity defense was not unreasonable under the facts
> of this case. Blake has a heavy burden to demonstrate deficiency in this regard
> because trial counsel's strategic or tactical decisions are "'virtually
> unchallengeable absent extraordinary circumstances.'" *Doleman v. State*, 112
> Nev. 843, 848, 921 P.2d 278, 280-81 (1996) (quoting *Howard v. State*, 106 Nev.
> 713, 722, 800 P.2d 175, 180 (1990), *abrogated on other grounds by Harte v.
> State*, 116 Nev. 1054, 1072 n.6, 13 P.3d 420, 432 n.6 (2000)). No "extraordinary
> circumstances" are present here. The circumstances of the shooting and Blake's
> actions after the event show that defending this case was an extremely difficult
> undertaking. Any defense pursued would have been a daunting task. Blake now
> views pursuing an insanity defense as an unreasonable trial strategy. Although the
> jury rejected Blake's insanity defense, the psychological evidence he presented
> persuaded the jury to find his emotional and mental state at the time of the
> shootings to be a mitigating circumstance during the penalty hearing.
>
>  Third, to the extent Blake contends that counsel failed to pursue other
> defenses, his claim is belied by the record. The jury was instructed on self-
> defense, defenses pursuant to NRS 194.010, second-degree murder, and voluntary
> manslaughter. And we noted in Blake's direct appeal that counsel addressed each
> of these theories in closing argument. *Blake v. State*, 121 Nev. 779, 791, 121 P.3d

567, 575 (2005). Therefore, the jury was aware of the theories Blake now suggests should have been pursued and rejected them as evidenced by the jury's verdict of first-degree murder and attempted murder.

Fourth, two of the defenses that Blake faults counsel for failing to present—imperfect self-defense and diminished capacity—have been rejected by this court. *Hill v. State*, 98 Nev. 295, 297, 647 P.2d 370, 371 (1982); *Crawford v. State*, 121 Nev. 744, 757, 121 P.3d 582, 591 (2005). Therefore, we conclude that Blake failed to demonstrate that counsel were ineffective for failing to pursue those defenses.

Based on the foregoing discussion, because Blake failed to show that counsel were deficient for pursuing an insanity defense or prejudice, we conclude that the district court did not err by summarily denying this claim. *See Strickland*, 466 U.S. at 694; *Kirksey* [*v. State*, 112 Nev. 980, 988, 923 P.2d 1102, 1107 (1996)].

ECF No. 46-12 at 6-8.

Blake argues that the Nevada Supreme Court's decision involved an unreasonable application of *Strickland* with respect to both performance and prejudice. As to performance, he contends that counsel's ignorance of the law governing the insanity defense undermines the court's conclusion that pursuing such a defense was a strategic decision entitled to deference. This argument has some merit, but the record does not support a finding that counsel's decision to argue insanity as a defense was as misguided as Blake claims.

Given the overwhelming evidence that Blake methodically executed two people and attempted to do the same to a third, counsel's defense efforts understandably focused on Blake's mental state when committing the crimes. Accordingly, he sought to develop defenses provided by Nev. Rev. Stat. § 194.010. ECF No. 40-6 at 5. Under § 194.010, the following persons are not subject to criminal punishment:

3. Persons who committed the act charged or made the omission charged in a state of insanity.

4. Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent, where a specific intent is required to constitute the offense.

5. Persons who committed the act charged without being conscious thereof.

Nev. Rev. Stat. § 194.010(3-5). As noted by the Nevada Supreme Court, the technical defense of diminished capacity is not available in Nevada.

In a pre-trial hearing, Christiansen argued that Blake should not be forced to enter a plea

of not guilty by reason of insanity under subsection 3 because doing so would limit his ability to present mistake-of-fact and lack-of-consciousness defenses under subsections 4 and 5. ECF No. 40-6 at 5-6. In her attempt to explain why that was not the case, the trial judge conflated all three subsections as forms of an insanity defense. *Id*. at 6-7. In warning Christiansen that *Finger* did not permit a defense based on Blake's delusional belief of future harm, she was referring to Christiansen's intent to present a mistake-of-fact defense. *Id.*

Dr. Mortillaro's direct testimony is recounted above. In essence, he opined that Blake's mental impairments made him prone to psychotic episodes, that being stabbed by Sophear triggered such an episode, and that, as a result, Blake could not appreciate the wrongfulness of his acts due to his delusional state. This theory of defense is not, in any way, undermined by *Finger*. And, at no point during his direct testimony did Dr. Mortillaro refer to Blake's fear that the victims and their boyfriends presented a future danger to Blake and his family. This was not brought up until the prosecutor cross-examined Dr. Mortillaro about his report. ECF No. 41-11 at 6, 8. Christiansen's closing argument in support of an insanity defense adhered to the theory advanced by Dr. Mortillaro's direct testimony and made no reference to Blake's fear of future harm. ECF No. 41-14 at 2-6.

Thus, Blake's argument that Christiansen pursued a defense that was invalid under *Finger* misses the mark. Clearly, *Finger* would have precluded a defense that Blake shot his victims due to a delusional fear that they were going to cause him harm in the future. That is not, however, the defense that Christiansen presented at trial. Arguably, focusing on a obtaining a second-degree murder verdict, rather than an insanity defense, may have been a marginally better strategy for him to pursue. As the Supreme Court has noted, however, "[r]eliance on 'the harsh light of hindsight' to cast doubt on a trial … is precisely what *Strickland* and AEDPA seek to prevent." Richter, 562 U.S. 86, 107, 131 S. Ct. 770, 789, 178 L. Ed. 2d 624 (2011). Given these circumstances, this court does not agree that the Nevada Supreme Court's conclusion as to counsel's performance involved an unreasonable application of *Strickland*.

Blake asserts that the Nevada Supreme Court's conclusion as to lack of prejudice was unreasonable because, had counsel conducted the necessary investigation and enlisted an expert

such as Dr. Mack, there is a reasonable probability that the Blake would not have been found guilty of first-degree murder. This argument fails for the reasons discussed above in relation to the court's prejudice analysis of Claim Two(A). Thus, the court concludes that the Nevada Supreme Court's conclusion as to prejudice did not involve an unreasonable application of *Strickland*.

Claim Three is denied.

*Claim Four*

In Claim Four, Blake alleges trial counsel were ineffective by failing to investigate and present evidence regarding Blake's dysfunctional family history, which included sexual, physical and substance abuse, neglect, extreme poverty and racism, and fetal brain injuries and prenatal abnormalities within Blake's immediate and extended families. Blake notes that Christiansen's preparation with respect to Blake's family was limited to speaking with his brother Anthony Fleming and sister Arlene Oliver, along with their mother, children, and some nieces and nephews, a week and a half before trial. According to Blake, Christiansen merely asked them about what kind person Blake is and how they would feel about never seeing him again. Blake also alleges that Arlene warned Christiansen that, due to three strokes and Alzheimer's, their mother would not be a good witness. Blake also notes that Christiansen also spoke with Blake's ex-girlfriend, Melanie Flowers, but he did not ask her or any of his family members about Blake's personal background or the family's social history.

At the penalty phase hearing, Christiansen presented the testimony of Oliver, Fleming, Jazmin Fleming (Blake's niece), Flowers, and Verna Peters (Blake's mother). Their testimony described Blake as a happy, talented person with a good sense of humor and as generous, caring person, who loves God but made a mistake that was totally out of character for him. They also described how the family would benefit from continued communication with Blake if he were allowed to live. Blake's mother's testimony was very brief and limited to one-sentence or one-word responses.

In his 2010 declaration, Christiansen states that, at the time of Blake's trial, he was "not as versed with benefits of interviewing family members and friends to create a social history."

ECF No. 125-7 at 173. Christiansen also confirms Blake's allegations about the focus of his inquiry when he spoke with family members. He further states that this was "not so much of a strategic decision, as it was reflective of my method of proceeding in capital cases at the time." *Id*.

   As discussed in *Summerlin v. Schriro*, the Supreme Court has resisted implementing specific guidelines to assess an attorney's performance under *Strickland* and has focused instead on "prevailing professional norms." 427 F.3d 623, 629 (9th Cir. 2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). With respect to the duty to investigate, however, *Summerlin* makes clear that, at the time of Blake's trial, a criminal defense attorney in a capital case had "a duty to investigate, develop, and present mitigation evidence during penalty phase proceedings." *Id*. at 630 (citing *Wiggins*, 539 U.S. at 521-23). And, while the reviewing court "must defer to a lawyer's strategic trial choices, those choices must have been made after counsel has conducted 'reasonable investigations or [made] a reasonable decision that makes particular investigations unnecessary.'" *Id*. (quoting *Strickland*, 466 U.S. at 691). In addition, "the investigation should include inquiries into social background and evidence of family abuse." *Id*. (citing *Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir.2005)).

Here, the record demonstrates that Christiansen failed to conduct any meaningful investigation into Blake's family history. Accordingly, his performance fell below prevailing professional norms. Blake has satisfied the performance prong of the *Strickland* test in this regard, so the question becomes whether he can also show prejudice. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. To prove prejudice, Blake must demonstrate a reasonable probability that, but for counsel's failure to investigate, the result of his trial would have been different. *See id*. at 694.

As noted by the Ninth Circuit, Blake has "provided thirteen declarations from Blake's family and friends" most of which "describe[] the abhorrent conditions of Blake's upbringing and family history, in extensive and gruesome detail." *Blake*, 745 F.3d at 983. These declarations can

be divided into three groups – Blake's extended family, Blake's siblings, and Blake's friends.

Extended family declarations -- The extended family group includes declarations from Blake's aunts and uncles (the siblings of Blake's mother, Verna) (ECF Nos. 21-2, 21-3, 173-2, 173-3, 173-7); one from the wife of one of the uncles (ECF No. 173-1); and one from Blake's second cousin (ECF No, 173-5). These declarations provide the family history mentioned by the Ninth Circuit. The aunts and uncles are all the offspring of Verna's mother, Mavis. As a young girl, Mavis lived and worked on a ranch in Texas, with her mother, who was a servant and nanny for the rich, white owner. The declarations compare the living conditions on the ranch to slavery and provide examples of violence, racism, and extreme poverty. Mavis left Texas in her early-teens and moved to Stockton, California, where she married at fifteen and had Verna at sixteen. The marriage soon failed, and Mavis then became involved in a series of physically and sexually abusive relationships, while relying on prostitution to support herself and her several children. The declarations describe in vivid detail the extremely dysfunctional and chaotic lives Verna and her siblings led, with numerous examples of violent crime, domestic violence, rape, incest, adultery, pedophilia, prostitution, substance abuse, and mental illness.

The declarations also note that Verna had a very contentious relationship with her mother, Mavis, that often included physical violence. They describe Verna as very promiscuous from a young age, who like her mother, was a victim of incest and eventually had a series of mostly unstable and physically abusive relationships that resulted in several children with different fathers. An alcoholic, drug addict, and unsuccessful at prostitution, Verna was chronically unemployed and rarely received financial support from the fathers of her children. So, she relied on public assistance and family members to provide for her and her children. The declarations also indicate that Verna abused alcohol and drugs while pregnant with Blake.

In addition, the declarations provide some information about Blake's father, Willie Blake. Willie was considerably older than Verna and either owned or worked at a night club when they met. At the time, he was also a well-known pimp in the Sacramento area who reportedly abused the women who worked for him. He was very controlling of Verna and, in the 1970's, persuaded her to sell a new home she had recently purchased in Sacramento with federal assistance and

move with him to Reno. Around that time, Verna and Willie married. During the marriage, Willie had sexual relations with two of Blake's older sisters and even lived with one of them for a period of time while separated from Verna. At some point, he won a lawsuit in relation to a fall while working at a construction job at the MGM Grand Hotel and Casino. According to the declaration of an uncle who states he lived with Verna and her family for five months in the early-1980s, Willie was not around most of the time and was not an affectionate father to Blake.

Sibling declarations -- The sibling group includes declarations from three of Blake's sisters, including Arlene Oliver, (ECF No. 22-4, 22-7, 173-6) and one from Blake's brother, Anthony Fleming (ECF No. 173-6). Oliver, Blake's eldest sister, is approximately fourteen years older than Blake. Her declaration discusses the drug and alcohol problems that plagued her family for generations, including her siblings. Her mother, Verna was an alcoholic, who became very flirtatious when drinking and met most of her children's fathers and boyfriends in settings where alcohol was involved. Verna drank alcohol during her pregnancies, including while pregnant with Blake. Oliver and all her siblings were diagnosed with some type of learning disability and were delayed in learning how to read. Blake always had tics and twitches in his face and body movements, for which his older brothers teased him. Mental illness was common in the family.

A large portion of Oliver's declaration describes the criminal activity of her uncles, as well as a few of her siblings. Much of this involved sexual assault, pedophilia, and prostitution, which she attributes to Mavis' influence. In addition, there were numerous instances of incest. Oliver also discusses Willie Blake in her declaration, noting that the worst thing he did during his relationship with Verna was to have sex with two of her older daughters, for which he paid them to support their drug addictions. Blake found out about this when he was in junior high school. Lastly, Oliver notes that, between Stockton, Sacramento, Reno, and Las Vegas, her family lived in more than 20 locations over the years, and that most those years were spent in poverty with the family relying on welfare.

The other three siblings who provided declarations are all much closer in age (within 5 years) to Blake, who was Verna's youngest child. With a few exceptions, the information in their

declarations is generally consistent and can be summarized as follows. Of Blake's four eldest siblings, all females, one (Oliver) was a good sister who did not drink or abuse drugs, always maintained employment, and took care of herself and her family; two spent a lot of time "running the streets," became drug addicts, and had sex for money with Willie Blake; and the fourth ran away from home at sixteen, never to return, after being beaten by Verna when Verna learned she was pregnant with her first child. Blake's eldest brother started going in and out of juvenile detention when he was 9 or 10 years old, then served lengthy prison sentences when he was older. Several of Verna's children ended up abusing alcohol and drugs. Most were diagnosed with a learning disability, and some have suffered from mental illness.

The family was very poor during most of Blake's childhood. When the family moved to Reno, Willie Blake became the family's only source of financial support other than welfare. Wille and Verna were always arguing. Willie had affairs with several women, and he sometimes threw Verna and her children out of the house when they lived in Reno and, later, in Las Vegas. While he never had a close relationship or spent any quality time with Blake, Willie favored Blake over the other children when Blake was a young child, taking him and Verna on vacations and buying him toys. All that ended when Willie divorced Verna for the first time when Blake was 12 years old. After that divorce, the family was left destitute, so much so that they were the subject of a television news report about their abject living conditions, much to the embarrassment of Verna's children. Willie and Verna subsequently remarried, but Willie's relationship with Blake effectively ended when they divorced a second time when Blake as about 14 years old. Blake appeared to suffer emotionally as a result of the abandonment.

Willie had a lot of money, especially after winning the lawsuit against the MGM Grand. He spent some of it on paying the two stepdaughters for sexual favors, which they in turn used to support their drug habits. It is not clear whether this started when they were minors, but they were no older than their late teens or early 20s. Willie even lived with one of them while separated from Verna. Willie also acted out sexually with Verna's other daughters and offered them money for sex as well, but was turned down. Verna did little, if anything, to protect her daughters from Willie. Although Willie no longer worked as pimp after the family moved to

Reno, he taught his sons how to manipulate women and make women loyal to them.

Verna physically abused all her children, beating them with extension cords, wire clothes hangers, rope, wet belts, switches from tree branches, and toy race car tracks. The beatings left marks, bruises, welts, and cuts. Blake seemed to get more severe beatings because, as Willie's son, Verna would take out her anger at Willie on him. Some of the beatings were so severe that Verna would keep Blake home from school to keep school officials from seeing his injuries. Verna also drank until she was intoxicated every day, and often passed out. The children were also exposed to physical altercations between Verna and her older daughters and between Verna and her uncles. While Verna and Willie were always arguing, there disputes were rarely physical.

Blake was diagnosed with a learning disability at an early age and attended special education classes. He was also very fidgety, constantly blinking, and unable to focus on one thing or sit still for more than a few minutes. As a result, he was bullied and teased by his siblings. He also wet his bed, which resulted in beatings from Verna. As he got older, the constant blinking turned into constant squinting, and he developed a stutter. Then later, he began displaying additional involuntary facial movements and making strange sounds from the back of his throat. Blake was never a troublemaker, but he would fly into a rage when pushed, provoked, or mistreated by others. During these episodes, he would hyperventilate and lose control of his emotions. Blake did not get along with the men Verna had relationships with after she divorced Willie. Not long after graduating from high school, Blake was shot in the leg by someone he did not know. He went to the hospital, but the doctors were unable to remove the bullet.

Blake started performing as a singer in the late 1980's in Pasadena, California, while he and his mother were living with Arlene. A few years later, he had an opportunity to work in entertainment in Japan, which he did throughout the 1990's. Blake's tics and strange movements were more pronounced when he returned from Japan in the late 1990's. While his siblings suspected he had experimented with drugs during his time in Japan, Blake denied using any drugs other than marijuana. Also, abusing drugs was out of character for Blake, who did not believe in using anything stronger than marijuana or alcohol. In addition, Blake also returned

from Japan a more mature and private person who was more serious about his music. He also started helping his mother financially and taking care of her. However, he also became more paranoid, stopped spending time in public places, and distanced himself from his family and friends.

Friend declarations -- The friend group includes declarations from Blake's friend from his teenage years to adulthood, Terrell Edwards, (ECF No. 22-3) and Blake's former girlfriend, Melanie Flowers (ECF No. 22-11). Roughly the same age, Edwards and Blake met when Blake was about 12 years old and living in the same Las Vegas neighborhood. They became best friends throughout their teenage years. Edwards' declaration states that Blake loved his mother, but did not respect her and always spoke harshly about her, mostly complaining that she was greedy and that whatever he did for her was never good enough. Blake's father, Willie, was never a meaningful part of Blake's life and did not live with him during those years, although Blake lived with Willie for a period of time when he was in the tenth grade. Blake told Edwards that Willie was a pimp when he was younger, and Edwards surmises that this, as well as his relationship with his mother, impacted Blake's view of women.

Blake also lived with Edwards' family for a year around 1989, when Blake had returned to Las Vegas from Pasadena. Throughout junior high and high school, Blake did not have much success dating and, instead, was ridiculed by girls, who called him ugly and made fun of him. Blake reacted with good humor, but only to cover his feelings of rejection and embarrassment. This later changed when Blake began gaining confidence due to his success in the music business and women began to pay more attention to him.

Edwards notes that he was surprised to learn that Blake was in special education classes, but looking back, he recalls that Blake was never in any of his regular classes. Blake was expelled from their high school in tenth or eleventh grade and was required to attend an alternative high school, apparently because he was so far behind. However, he was able to get the necessary credits to re-enroll in their high school his senior year and finish on time. Blake's primary passion was music and entertainment, which he took very seriously and to which he was very committed.  As a perfectionist, he often became frustrated with fellow bandmembers who

1    were not similarly committed, which caused a lot of turn-over in his group.

2         Edwards noticed Blake's tics and involuntary body movements from the time they met.

3    They included rapid blinking, sudden mouth stretching movements, shaking the telephone while

4    talking on it, and stuttering episodes. Blake also had moments when he mentally drifted away

5    from something he was doing, staring off into the distance in a daze. Blake was also very moody

6    – angry and out of control one moment, then totally calm the next. Edwards also recounts several

7    instances of Blake suffering head injuries for which Edwards cannot remember him receiving

8    medical attention. In one, a girl in high school who had argued with Blake returned to school the

9    next day with a handbag filled with bricks that she struck Blake in the head with, knocking him

10   unconscious. Three other instances involved a car accident, a bicycle accident, and a moped

11   accident.

12        The only substances Edwards knew Blake to use were alcohol and marijuana, primarily

13   the latter. Blake had a good sense of humor and was also very generous, giving money homeless

14   people and loaning money without expecting to get paid back.

15        After meeting him in 1990, Flowers was Blake's live-girlfriend for the better part of three

16   years between 1990 and 1993. She relates the following. Blake was an aspiring, but struggling

17   singer who spent most of his time practicing with his band while she worked a full-time job in

18   education. She soon realized that Blake was a little slow, mentally, and had difficulty following

19   conversations with her and others. He also had difficulty finding locations while driving and

20   could not fill out forms without assistance. Blake always hung out with the same small group of

21   friends and was introverted when he was in an unfamiliar place or among strangers. When he

22   was performing on stage, however, he fed off the attention and was very outgoing and humorous

23   with the audience and with fans afterward. While he could appear confident and sure of himself

24   on the surface, he had serious self-esteem issues and was self-conscious about his bodily tics,

25   which included rapid blinking, jerking motions in his hips and knees, fidgeting, ticking and

26   hissing noses from his nose and throat, stretching his mouth, and blowing into his closed fists.

27   Blake also seemed like he might have narcolepsy, often randomly falling asleep without

28   warning.

In addition, Blake never wrote or read anything while in Flowers' presence, could not manage money, and had a limited vocabulary, often mispronouncing simple words. He was compulsive about cleanliness and became even more so when he returned from Japan. He was also very sensitive about being embarrassed, especially in public, and had serious abandonment issues. When Blake and Flowers got into heated arguments, he would calm down afterwards and act like nothing was wrong. Later, Blake would not remember what was said during these arguments and apologize profusely when Flowers told him. Flowers thinks the apologies were sincere because, during the arguments, it was like Blake was not mentally present. He would have an empty look on his face, hyperventilate, and his tics and fidgeting would be more pronounced.

Blake did not like talking about his family. Flowers never met Blake's father, and Blake never mentioned interacting with him. Blake's mother was always nice to Flowers. Much of Blake's drive to be successful was so that he could provide for his mother. Blake told Flowers that his mother had had a hard life and, after raising her own children, had become stuck raising some of her grandchildren. Blake and Flowers broke up around 1993 sometime after he was arrested for tampering with the fuel line in her car. He was accused of trying to rig it to explode, but she tried to explain to the police that Blake knew nothing about cars and was not smart enough to devise such a scheme. In her opinion, he was simply trying to disable the car after she told him he was no longer allowed to use it.

To determine whether Blake has met his burden of showing prejudice, this court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). In addition to the circumstances of the murders and attempted murder proved during the guilt phase, the prosecution presented the following evidence during the penalty phase of Blake's trial. ECF No. 42-3 at 9-16; ECF No. 42-4 at 2-21. In 1988, when he was 18 years old, Blake hit a 17-year-old with a baseball bat, resulting in the victim suffering a broken nose, stitches in his head, and bruises. Later that year, Blake was in a car with another person when a woman driving another car yelled at them for going too slow. At the next traffic light, he got out of the car he was in, threw a cup of ice in the woman's face, and

punched her twice in the mouth. The following year he got into a fight with another 17-year-old and stabbed him with a knife in the right collarbone and above the left eyebrow.

The car tampering incident mentioned in Flowers' declaration took place in the summer of 1992. In addition to the fuel line being disconnected as Flowers reported, the car's battery had been tipped on its side and the disconnected fuel line had been placed near an exposed wire coming from the battery's positive terminal. Later that year, Blake got into an argument with Flowers at a shopping mall which ended with him hitting her and shoving her to the ground. Also in 1992, Blake went the home of a friend's house and, after being let in by the friend's mother, produced two butcher knives and ran toward the friend's bedroom saying that he was going to kill him. The friend's mother blocked Blake and pushed him out of the house.

In July of 1996, Blake was involved at disturbance at a motel resulting in the police being called. When the officers attempted to pat him down for weapons, Blake resisted. After subduing and handcuffing Blake, the police found marijuana in a fanny pack he was wearing. Blake attempted to flee while handcuffed, but tripped and fell. In 1999, Blake was convicted for possession of a forged passport. Also in 1999, Blake was arrested and charged with two counts of living off the earnings of prostitutes and two counts of living with a prostitute. He subsequently pled guilty to two misdemeanor counts of soliciting prostitution. While Kim Bonnette and Jinah Chung lived with Blake in 2002 and early 2003, Blake beat both of them, told them that he had people watching them, and required them to earn a certain amount of money before being allowed to return home.

The State also presented victim impact testimony from Kim Choy, Kim and Sophear's mother, and Priscilla Van Dine's father and sister.

Having considered reweighed the evidence in aggravation against the totality of available mitigating evidence, this court concludes that Blake has not satisfied the prejudice prong of the *Strickland* test. In reaching this conclusion, the court notes the following. Mavis's early life on the Texas ranch may have been the originating source of much of the dysfunctionality of her progeny, but she left the ranch and moved to California before Blake's mother was even born and at least 40 years before Blake was born. Similarly, a significant portion of Blake's family

history evidence consists of numerous examples of the violent crime, domestic violence, sexual deviance, incest, substance abuse, and mental illness that was rampant among Blake's mother's siblings and their respective families. However, Blake's direct exposure to most of this was limited by virtue of Blake's mother leaving California with her children and relocating to Reno when Blake was five years old, then later moving again to Las Vegas. In this regard, the court notes that the declarations provided by Blake's extended family members include very little information about Blake himself. Consequently, the court places more weight on the declarations provided by Blake's siblings and friends, who had far more personal contact with him during his childhood and young adulthood.[3]

This is not to say Blake's upbringing was not fraught with deeply troubling living conditions and events. For most of his childhood, he lived in poverty with a promiscuous, alcoholic mother, who was physically and emotionally abusive and had numerous boyfriends and husbands coming in and out of her life. His father was mostly absent and, in all likelihood, was at least partially responsible for Blake's terrible treatment of women later in life. In addition, Blake was undoubtedly traumatized when he learned of his father's sexual activities with his half-sisters. However, there is no evidence that Blake was ever sexually abused by anyone. And, while the beatings he received from his mother were plainly beyond the bounds of acceptable punishment, there is little to no evidence that Blake was physically abused by anyone else, beyond being occasionally being pushed around by his older siblings.

As for mental impairments, the evidence establishes that Blake was learning disabled, mentally slow, and suffered from undiagnosed Tourette syndrome throughout his childhood. Due to these impairments, he struggled in school and was teased by his sibling and others. Add to these the evaluations and diagnoses provided by Drs. Mortillaro, Bittker, High, and Mack, which are discussed above. Verna's drug and alcohol use while pregnant with Blake may have caused or contributed to Blake's impairments, but he has not been conclusively diagnosed with FASD.

---

[3] As for the declaration of Arlene Oliver, the court notes that she was nearly 20 years old when the family moved to Reno and that she chose to remain in California. ECF No. 5-13 at 91. Thus, her younger siblings, who are closer in age to Blake, are in a better position to provide firsthand information about Blake's upbringing.

1  Likewise, it is not clear what impact, if any, the head injuries Blake suffered as a teenager may

2  had on his mental development. Unlike his mother and many of his relatives, Blake did not

3  develop a serious substance abuse problem. He drank alcohol beginning at sixteen, but not to

4  excess, and was only a casual drug user, sticking mainly to marijuana.

5  On balance, the available mitigating evidence does satisfy the "high bar" established by

6  the Supreme Court for granting relief in cases "involving claims of ineffective assistance of

7  counsel at the penalty phase of a capital trial." *See Washington v. Shinn*, 21 F.4th 1081, 1096- 98

8  (9th Cir. 2021) (citing *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins*, 539 U.S. 510; *Rompilla*

9  *v. Beard*, 545 U.S. 374 (2005); and *Porter v. McCollum*, 558 U.S. 30 (2009) and discussing the

10  compelling mitigation evidence presented in each of these cases). As in *Washington*, a

11  comparison of the mitigating evidence in this case with the mitigating evidence omitted by

12  counsel in these Supreme Court cases confirms that Blake was not prejudiced by his counsel's

13  shortcomings. *See id*. at 1098-99. Considering the utter senselessness of the murders and

14  attempted murder and the cold and calculated manner in which Blake carried them out,

15  combined the other aggravating evidence presented by the State, there is not a reasonable

16  probability that the available mitigating evidence would have persuaded a reasonable juror to

17  spare him the death penalty. Blake's jury found that his mental, emotional, or physical state at

18  the time of the incident was a mitigating circumstance, but still imposed the death sentence. The

19  additional mental health evidence from Dr. Mack and Dr. High would not have added significant

20  weight to Blake's mitigation case. *See Washington*, 21 F.4th at 1099 ("[A]lthough the evidence

21  of Washington's head injuries suggests a difficult childhood and perhaps might provide a more

22  complete picture of his background than was presented at trial, that evidence is not nearly as

23  substantial or extreme as the mitigating evidence in the four Supreme Court decisions."). And,

24  for reasons discussed above, the Blake's family history evidence was simply not sufficiently

25  compelling either.

26  Claim Four is denied.

27  *Claim Five(A)*

28  In Claim Five(A), Blake alleges that his trial counsel were ineffective during voir dire

proceedings. He bases this claim on the following allegations. Counsel failed to object to the trial court's repeated attempts to rush the voir dire proceedings and consequently did not adequately question the venire members. Counsel failed to ask meaningful questions of both venire members and individuals ultimately seated on the jury. Trial counsel failed to rehabilitate potential jurors Doris Zacarias and Joseph Robertson after they expressed opinions favorable to the defense. Trial counsel failed to move the court to individually voir dire venire members regarding the issue of racial bias, move to remove venire member David Dupree after he expressed racist views, and specifically question venire members about racial bias.

With respect to the first allegation Blake points to the fact that the voir dire was completed in a single afternoon and to the trial judge's various comments trying to get the attorneys to speed up the proceedings. He claims that, due to the brevity of the proceeding, his counsel failed to individually question several members of the venire about their ability to serve as fair and impartial jurors. However, the only specific example he cites is counsel's failure "to ask juror Teresa Bullock whether she would be biased because of her experience as a victim of a home invasion sexual assault." ECF No. 172 at 101. As discussed below in relation to Claim Seven(D1) that is not sufficient to establish that Blake suffered *Strickland* prejudice as a result of the length of the voir dire.

As for counsel's alleged failure to ask meaningful questions, Blake contends that counsel neglected to ask whether venire members would consider life with or without the possibility of parole if Blake were convicted of the first-degree murder of two women and also failed to ask questions about the mitigation evidence in Blake's case. As respondents point out, however, trial counsel asked a wide range of questions concerning several topics, including impartiality over considering the death penalty, the ability to impartially consider gruesome photographs as evidence, and the ability to objectively weigh the credibility of police officers and medical professionals. ECF Nos. 40-6 through 40-9. As for seated jurors, Blake has not demonstrated any of them were impaired by actual or implied bias. Accordingly, Blake fails to establish a reasonable probability of a different outcome had counsel asked different questions of prospective jurors or seated jurors. *See Fields v. Brown*, 503 F.3d 755, 776 (9th Cir. 2007)

1    (finding no prejudice under *Strickland* where petitioner failed to show juror bias).

2           For potential jurors Zacarias and Robertson, Blake faults counsel for not asking them any

3    questions to attempt rehabilitate them when they indicated that they would not be willing to

4    impose the death penalty as a punishment. Both potential jurors made it abundantly clear that

5    there was no circumstance in which they would consider the death penalty an appropriate

6    punishment. ECF No. 40-8 at 14-16. The trial court did not err by striking them for cause. *See*

7    *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). Blake has not shown that additional questioning

8    would have increased the likelihood of either potential juror being seated on his jury. Thus, here

9    again, he has not established ineffective assistance of counsel.

10          Finally, Blake claims that counsel was ineffective for not asking the trial court to

11   individually voir dire members of the venire about racial bias, not moving to question David

12   Dupree outside the presence of other venire members to prevent him from contaminating the jury

13   with racist beliefs, and not asking specific jurors specific questions designed to expose racial

14   bias. Blake proffers no evidence suggesting a likelihood that a member of the jury in his case

15   was racially biased. Counsel promptly had Dupree removed for cause after briefly questioning

16   him about his views. ECF No. 40-8 at 11. And, there is no reason to conclude that, had counsel

17   questioned the venire on racial bias, there is a reasonable probability that the outcome of the

18   Blake's trial would have been different. The evidence of Blake's guilt was overwhelming and,

19   there is no evidence that racial bias played any role in the verdict.

20          Claim Five(A) is denied.

21                 *Claim Five(B)*

22          In Claim Five(B), Blake alleges that his trial counsel were ineffective for failing to object

23   to prosecutorial misconduct. He bases this claim on the following allegations. Counsel failed to

24   object to the prosecutor's improper testimony during cross-examination of Dr. Mortillaro.

25   Counsel failed to object to prosecutorial misconduct during voir dire. Counsel failed to object to

26   prosecutorial misconduct during closing arguments. Counsel failed to object to improper victim

27   impact evidence.

28          Blake's allegations regarding Dr. Mortillaro's cross-examination are addressed in the

court's discussion of Claim Two(A), above.

With respect to alleged prosecutorial misconduct during voir dire, Blake contends counsel should have objected when the prosecution asked the jury questions that, according to Blake, were phrased in a manner suggesting that Blake's guilt of first-degree murder and the proof of aggravating circumstances were foregone conclusions. Blake claims the prosecution's improper questioning deprived him of the constitutionally guaranteed presumption of innocence, but this court does not agree. The only example Blake's cites was merely an attempt by the prosecution to point out the distinction between thinking about the death penalty in the abstract and actually being on a jury that has to decide whether to impose the penalty. *See* ECF No. 124 at 194.

Likewise, the court also sees no merit to Blake's claim that counsel was ineffective by not objecting to improper prosecution argument. He asserts that the prosecutor's repeated use of "we," "us," and "our" throughout his guilt phase argument improperly suggested that the jury was aligned with the State. He further alleges that the prosecutor improperly mischaracterized Blake's defense as an attempt to shift blame for the murders and attempted murder to the victims. In addition, Blake claims the prosecutor made comments that improperly denigrated Blake's attempt to argue mental state as a mitigating factor. To the extent any of the cited arguments were improper, such impropriety did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181-83 (1986) (denying habeas relief because prosecutor's closing argument, while condemnable, did not render conviction "fundamentally unfair").

Lastly, Blake contends that victim impact evidence presented in the penalty phase of his trial was improper because it either set forth unfair characterizations of Blake, concerned the impact of the crime on individuals other than the witnesses themselves, or was unduly prejudicial and cumulative. He cites to *Booth v. Maryland*, 482 U.S. 496 (1987), noting that while the case was partially reversed by *Payne v. Tennessee*, 501 U.S. 808 (1991), the holding in *Booth* prohibiting the admission of a victim's family members' characterizations and opinions about the crime remains intact.

Respondents concede, and this court agrees, that a small portion of the testimony from Priscilla Van Dine's father, Donald Van Dine, was improper under *Booth* or *Payne* because it included characterizations of Blake and his crimes. *See Payne*, 501 U.S. at 830 n.2. At one point, Van Dine stated that, contrary to the image of Blake portrayed by media and by his agent, the guilt phase of the trial exposed him as "the cold-blooded calculated executioner that he is." ECF No. 42-5 at 5. Further on in his testimony, he implored the jury to hold Blake "accountable," having already decided his guilt. *Id*. at 6. The testimony of Kim Choy and Priscilla Van Dine's sister may have extended marginally beyond the impact of the victims' deaths, but it was not otherwise improper. There is no merit to Blake's contention that the testimony Kim and Sophear's mother was improper because it was cumulative.

Applying *Strickland*, sound trial strategy generally dictates that counsel refrain from objecting to victim impact evidence because of concern that it might be poorly perceived by the jury. Only the few noted comments by Mr. Van Dine rose to the level of possibly warranting an objection, but it cannot be said that trial counsel's failure to object fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88. Moreover, Blake falls well short of establishing *Strickland*-level prejudice given the strength of the State's aggravating evidence.

Claim Five(B) is denied.

*Claim Five(C)*

In Claim Five(C), Blake alleges that his trial counsel were ineffective for failing to object to improper jury instructions. Specifically, he faults counsel for not objecting to the reasonable doubt instruction, the second-degree murder instruction, the malice instruction, the equal and exact justice instruction, and the death calculus instruction.

When a federal habeas court reviews a claim of instructional error, "[t]he only question … is 'whether [a jury] instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (internal citation omitted). When the claim is that the instruction was ambiguous, the court must determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Id.* at 72 (internal quotation marks and citations omitted). Because Claim

40

Five(C) is an ineffective assistance of counsel claim, Blake must demonstrate that counsel's

failure to object to the instruction was an error "so serious that counsel was not functioning as

the 'counsel' guaranteed the defendant by the Sixth Amendment " and that, as a result, the

defendant was deprived of "a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at

687.

Blake cites the following language in the reasonable doubt instruction:

> A reasonable doubt is one based on reason. It is not mere possible doubt
> but is such a doubt as would govern or control a person in the more weighty
> affairs of life. If the mind of the jurors, after the entire comparison and
> consideration of all the evidence, are in such a condition that they can say they
> feel an abiding conviction of the truth of the charge, there is not a reasonable
> doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.

ECF No. 42-2 at 9 (guilt phase), ECF No. 42-8 at 14 (penalty phase).

The Ninth Circuit evaluated the same reasonable doubt instruction in *Ramirez v. Hatcher*.

136 F.3d 1209, 1210-11 (9th Cir. 1998). The Ninth Circuit held that "[a]lthough [it did] not

herald the Nevada instruction as exemplary, [it] conclude[d] that the overall charge left the jury

with an accurate impression of the government's heavy burden of proving guilt beyond a

reasonable doubt" such that "the jury charge satisfied the requirements of due process." *Id.* at

1215; *see also Nevius v. McDaniel*, 218 F.3d 940, 944 (9th Cir. 2000) (holding that the

reasonable doubt jury instruction was identical to the one in *Ramirez*, so "[t]he law of this circuit

thus forecloses Nevius's claim that his reasonable doubt instruction was unconstitutional").

Because the challenged language has been determined to be constitutional by the Ninth Circuit

and was not otherwise improper, Blake's trial counsel was not deficient for not objecting to the

instruction.

Blake contends the trial court's instructions defining second-degree murder during the

guilt phase, were constitutionally inadequate. Instruction 11 read as follows:

> All murder which is not murder of the first degree is murder of the second
> degree. Murder of the second degree is murder with malice aforethought but
> without the admixture of premeditation and deliberation.

ECF No. 42 at 13.

Instruction 12 read as follows:

   If you find that the State has established the defendant has committed first degree murder, you shall select first degree murder as your verdict.

   The crime of first degree murder includes the crime of second degree murder. You may find the defendant guilty of the lesser included offense of second degree murder if:

   (1) after first fully and carefully considering the charge of first degree murder, you either (a) find the defendant not guilty of that charge, or (b) are unable to agree whether to acquit or convict on that charge; and

   (2) all twelve of you are convinced beyond a reasonable doubt that the defendant is guilty of second degree murder.

   If you are convinced beyond a reasonable doubt that the crime of murder has been committed by the defendant, but you have a reasonable doubt whether such murder was of the first or second degree, you must give the defendant the benefit of that doubt and return a verdict of murder of the second degree.

*Id.* at 14.

   Blake argues the instructions were unconstitutional because they improperly defined second-degree murder in the negative. He further argues the Nevada Supreme Court in *Byford v. State*, 994 P.2d 700, 712 (Nev. 2000), defined second-degree murder in the positive. According to Blake, the trial court should have provided a positive definition of second-degree murder that the jury could consider as an alternative to first-degree murder.

   Blake has not shown that the instructions failed to comply with state law or that there is a reasonable likelihood that the jury applied the instructions in a way that violates the Constitution. And, given the manner in which Blake killed his victims, there is no reasonable chance that the jury would have opted for second-degree murder had the trial court defined second-degree murder in the manner Blake prescribes. Thus, Blake's trial counsel was not deficient for not objecting to the instructions.

   Blake contends that the trial court's malice instruction violated his right to due process because it is "vague and pejorative" and "allows the jury, in a close case, to convict because it believes the defendant to be a 'bad man.'" ECF No. 124 at 267.  The trial court instructed that "[m]alice may be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." ECF No. 42 at 9. He further claims that the language in a separate instruction that malice may arise "from a heart

fatally bent on mischief," similarly induced jurors to return a guilty verdict because they believed Blake was a bad person. *Id*. at 7.

Here again, there is no reasonable likelihood that the jury applied it in a way that violated Blake's constitutional rights. *See Estelle v. McGuire*, 502 U.S. at 72 (noting that the suspect instructions must be considered in the context of the instructions as a whole and the trial record). The jury found Blake guilty of first-degree murder because it found that the murder was a willful, deliberate, and premeditated act. The finding of willfulness, premeditation, and deliberation conclusively established express malice, with no need to rely upon implied malice. *See Scott v. State*, 554 P.2d 735, 738 (Nev. 1976). And, because this was not a "close case," as Blake claims, there is not a reasonable likelihood that the jury convicted him merely because they believed he was a bad person.

Next, Blake claims the trial court erroneously instructed the jury that it must deliberate "with the sole, fixed and steadfast purpose of doing equal and exact justice between the defendant and the State of Nevada." ECF No. 42-2 at 18 (guilt phase), ECF No. 42-8 at 21 (penalty phase). He argues the instruction created a reasonable likelihood that a juror would overlook the beyond a reasonable standard the State was required to meet and the presumption of innocence to which Blake was entitled. According to Blake, the instruction would cause a juror to "view the parties on 'equal' footing as if this were a civil case." *Id*.

A reasonable juror, taking the jury instructions as a whole, would not interpret the instruction in the manner Blake claims. Because other instructions specifically addressed the presumption of innocence and the burden of proof necessary for a conviction, this court rejects the notion that the jury was misled on these concepts due to one ambiguous phrase in a lengthy set of instructions. Trial counsel was not ineffective by not challenging the "equal and exact justice" language.

Finally, Blake claims the trial court did not adequately instruct the jury that it could not consider non-statutory character evidence when assessing Blake's eligibility for the death penalty under Nevada law. This claim lacks merit for the reasons discussed below in relation to Claim Five(D).

Blake has not established that counsel's failure to object to jury instructions deprived him of his right to counsel under the Sixth Amendment. Claim Five(C) is denied.

*Claim Five(D)*

In Claim Five(D), Blake alleges that his trial counsel were ineffective for failing to object to the presentation of non-statutory aggravating character evidence prior to the eligibility calculus. He contends that trial counsel unreasonably failed to object or request a curative instruction when the prosecution emphasized non-statutory aggravating character evidence during closing arguments. He refers, specifically, to the prosecution's discussion of victim impact evidence and evidence of his criminal history. According to Blake, such "other matter" evidence can be considered only after the jury has determined whether the defendant is eligible for the death penalty.

In Nevada, there is a three-step procedure for imposing the death penalty. First, the jury must unanimously find that an aggravating factor is present beyond a reasonable doubt. Nev. Rev. Stat. § 175.554(3); *Hollaway v. State*, 6 P.3d 987, 996 (Nev. 2000). Second, each juror must individually conclude that the mitigating factors do not outweigh the aggravating factors. *Id*. Third, the jury must unanimously decide to impose the death penalty rather than a lesser sentence. *Id*. The State may present "other matter" evidence -- that is, evidence not bearing the aggravating or mitigating circumstances, but for "only one purpose: for jurors to consider in deciding on an appropriate sentence *after* they have determined whether the defendant is or is not eligible for death." *Hollaway*, 6 P.3d at 997 (applying Nev. Rev. Stat. § 175.552(3) (emphasis added)). In addition, when such evidence is offered, "the court must admonish the jury that the evidence is not to be used in determining the existence or the weight of aggravating circumstances." *Id*.

This claim is without merit. The prosecutor's closing argument was not evidence, and the jury was so instructed. ECF No. 42-8 at 21. The jury was also instructed to not consider "other evidence" in determining the existence of aggravating and mitigating circumstances. *Id*. at 8. In his closing argument, the prosecutor accurately described the procedure the jury was to follow in deciding Blake's sentence. ECF No. 42 at 10-15. He made clear that the jury was to consider the

death penalty only after determining that Blake was eligible for it based on the first two steps described above. *Id*. at 13 ("So we've answered the first of the two questions, can you consider the death penalty, and I would submit to you that you can."). It was in that context that the prosecutor properly discussed Blake's criminal history *Id*. at 13-14. While the prosecutor discussed victim impact evidence in arguing that the jury should reject one of Blake's proposed mitigating circumstances, such argument did not rise to the level of objectionable prosecutorial misconduct.

Blake has not shown that his trial counsel's failure to object or request a curative instruction placed his performance below an objective standard of reasonableness or that it had any effect on the outcome of his trial. Claim Five(D) is denied.

### Claim Five(E)

In Claim Five(E), Blake alleges that his trial counsel were ineffective in failing to object to the lawful arrest aggravating factor. As discussed below in relation to Claim Eight, the State's application of the factor in Blake's case was not improper. Thus, Blake's counsel was not ineffective by failing to object to it. Claim Five(E) is denied.

### Claim Five(F)

In Claim Five(F), Blake alleges that his trial counsel were ineffective for failing to request a change of venue. Blake cites media accounts describing Blake as a rapper, hip-hop artist nicknamed "Slinkey" who was considered armed and dangerous and saying that police were seeking to apprehend him for "executing" two women and shooting a third. ECF No. 124 at 210. He further claims that newspaper accounts inaccurately described the circumstances surrounding the crime, including the nature of his relationship with the victims, and his alleged financial motive for the shooting. He also alleges that "[t]he media prejudicially described [his] relationship with the victims on several occasions as involving an Asian women escort service run by [him]" and that inadmissible information about his prior record was described in newspaper accounts. *Id*.

A criminal defendant has the right to be tried by a panel of impartial jurors. *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998). To support a motion to transfer venue based on

lack of impartiality in the jury pool, a criminal defendant must show either presumed or actual prejudice. *Gallego v. McDaniel*, 124 F.3d 1065, 1070 (9th Cir. 1997). To establish actual prejudice, a criminal defendant must show that at least one juror in his case demonstrated actual hostility or partiality that could not be laid aside to impartially judge the defendant's guilt. *Harris v. Pulley*, 885 F.2d 1354, 1363 (9th Cir. 1988). To establish presumed prejudice, a criminal defendant must show that the community in which the trial was held "was saturated with prejudicial and inflammatory media publicity about the crime," such that he was unable to receive a fair trial. *Ainsworth*, 130 F.3d at 795. "'A presumption of prejudice' because of adverse press coverage 'attends only the extreme case.'" *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011) (quoting *Skilling v. United States*, 561 U.S. 358, 381 (2010); *see also Harris*, 885 F.2d at 1361 ("The presumed prejudice principle is rarely applicable and is reserved for an extreme situation." (citation omitted)).

With respect to actual prejudice, Blake contends that the record shows that a good portion of prospective jurors had heard about the case in the media, and he also points to the voir dire examination of prospective juror William Allmon. As discussed below in relation to Claim Seven(D1), Allmon indicated that he had already concluded that Blake was guilty based on what he had heard in the media.

Exposure to pretrial publicity alone is not sufficient to establish actual prejudice. The question is "whether jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant." *Harris*, 885 F.2d at 1364 Blake has made no such showing. As for Allmon, he was not seated as a juror and his impressions or opinions alone are not sufficient to establish actual prejudice. *See id.* ("The Supreme Court has indicated that a key factor in gauging the reliability of juror assurances of impartiality is the percentage of veniremen who 'will admit to a disqualifying prejudice.'" (quoted source omitted)); *see also Hayes*, 632 F.3d at 511.

Blake also falls well short of showing presumed prejudice. The crime occurred in Las Vegas, a sizeable community in which violent crime is not uncommon. *See Skilling*, 651 U.S. at 382 ("[W]e have emphasized in prior decisions the size and characteristics of the community in which the crime occurred.") Blake's presumptive prejudice argument is based on twenty news

articles published between March 2003 and April 2004. The articles, however, "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id*. In addition, they "did not present the kind of vivid, unforgettable information [the Supreme Court has] recognized as particularly likely to produce prejudice." *Id*. at 384.

In summary, Blake has not shown that trial counsel had sufficient grounds to support a meritorious, or even arguable, motion for change of venue. Thus, he has not shown that counsel was ineffective by failing to bring such a motion. Claim Five(F) is denied.

*Claim Five(G)*

In Claim Five(G), Blake alleges that his trial counsel were ineffective because they waived Blake's right to a preliminary hearing in reliance on the State's customary practice of providing the notice of intent to seek the death penalty at the defendant's initial appearance. According to Blake, he was forced to go to trial without the benefit of having the recorded testimony of the State's witnesses because counsel relied on the State's customary practice rather than the rules governing death penalty cases, which allowed the State 30 days from the filing of an information to file the notice of intent.

Blake presented this claim in his first state habeas proceeding. The Nevada Supreme Court addressed the claim as follows:

> Blake next argues that the district court erred by summarily denying his claim that trial counsel were ineffective for allowing him to waive his right to a preliminary hearing without securing assurances from the State that the death penalty would not be pursued. Blake argues that he was prejudiced because he was prevented from securing a probable cause hearing respecting the aggravating circumstances alleged, which could have avoided "the possibility of a death determination," and allowed him to approach his case differently or "explore other viable defenses to prevent the imposition of death." Blake's claims lack merit because he was not entitled to a preliminary hearing or probable cause determination respecting the aggravating circumstances. *Floyd v. State*, 118 Nev. 156, 166, 42 P.3d 249, 256 (2002), *abrogated on other grounds by Grey v. State*, 124 Nev. 110, 178 P.3d 154 (2008).

> Even assuming counsel waived the hearing based on an erroneous belief that the State had decided not to seek the death penalty because it had not filed a notice in the justice court, Blake cannot demonstrate that counsel's actions in this regard prejudiced him. The State's notice of intent to seek the death penalty comported with SCR 250(4)(c), and as this court concluded on direct appeal, there is more than sufficient evidence to support the aggravating circumstances. *Blake*

*v. State*, 121 Nev. 779, 795, 800, 121 P.3d 567, 577, 581 (2005). He thus would have faced the death penalty even if counsel had proceeded through a preliminary hearing. Because Blake failed to demonstrate that counsel were deficient or prejudice, the district court did not err by summarily denying this claim. *See Strickland*, 466 U.S. at 694; *Kirksey*, 112 Nev. at 988, 923 P.2d at 1107.

ECF No. 46-12 at 5-6.

Blake has not demonstrated that the state court's conclusion as to lack of *Strickland* prejudice is unreasonable. In particular, he does not substantiate how the outcome of his trial would have been different with the benefit of witness testimony from a preliminary hearing. As respondents note, trial counsel was able to impeach key witnesses with their prior statements. ECF No. 163 at 108. Blake does not respond to this argument or identify any testimony that could have been impeached if a preliminary hearing had been conducted.

Claim Five(G) is denied.

*Claim Five(H)*

In Claim Five(H), Blake alleges that his trial counsel were ineffective by failing to provide him with the actual representation of two attorneys and by failing to preserve their work product. According to Blake, Nevada Supreme Court Rule 250 entitled him, as capital defendant, to the representation of two attorneys, but one of his appointed attorneys, David Brown, "did not act as a second advocate on [his] behalf." ECF No. 124 at 213. He further claims that Rule 250 required counsel to document the results of witness investigations and other strategic decisions throughout his criminal proceedings, but that his counsel failed to do so.

Blake's allegation with respect to Brown is premised on the allegation that his participation was limited to making closing arguments during the penalty phase. As respondents note, however, Brown also cross-examined a State witness during the guilt phase and examined defense witnesses during the penalty phase. ECF No. 163 at 111. In any case, Blake fails demonstrate Brown's limited participation amounted to a violation of his constitutional rights, in particular, how the outcome of his case may have been different had Brown's role been larger. Likewise, Blake fails to show that counsel's alleged failure to document their work product had any impact on the result of his case.

Claim Five(H) is denied.

1          *Claim Five(I)*

2          In Claim Five(I), Blake alleges that his trial counsel were ineffective for failing to object

3   to off-the-record bench conferences. Blake to cites to several instances of bench conferences

4   during his trial that were not reported or transcribed. He claims that Nevada Supreme Court Rule

5   250, as it existed at the time, required the reporting of all proceedings in a capital case. He

6   further claims that the resulting deprivation of meaningful appellate review is structural error

7   requiring reversal of his judgment of conviction.

8          Blake bases his structural error claim on *Weaver v. Massachusetts*, 137 S.Ct. 1899

9   (2017), a case in which the Supreme Court recognized that a violation of a defendant's right to a

10  public trial generally entitles a defendant "to 'automatic reversal' regardless of the error's actual

11  'effect on the outcome.'" *Weaver*, 137 S.Ct. at 1910 (quoted source omitted). The Court confined

12  that holding, however, to instances "where there is an objection at trial and the issue is raised on

13  direct appeal." *Id*. The primary issue in *Weaver*  was "what showing is necessary when the

14  defendant does not preserve a structural error on direct review but raises it later in the context of

15  an ineffective-assistance-of-counsel claim." *Id*. The Court held that, in those cases, the defendant

16  was required to make the prejudice showing under *Strickland* to obtain relief. *Id*. at 1912.

17         Thus, *Weaver* does not help Blake for two reasons. First, the trial court did not violate

18  Blake's right to a public trial by conducting off-the-record bench conferences. Such conferences

19  are a well-established method for the court to privately discuss matters with counsel without

20  having to remove the jury. *See Rovinsky v. McKaskle*, 722 F.2d 197, 201 (5th Cir.

21  1984) ("Sidebar conferences in which the defendant's counsel participates without objection do

22  not violate the right to a public trial.") Second, even if such a violation occurred, Blake would

23  still need to demonstrate prejudice under *Strickland*, which he has not done.

24         Claim Five(I) is denied.

25         *Claim Five(J)*

26         Claim Five(J), which alleges cumulative error and prejudice arising from counsel's

27  allegedly deficient performance, is denied for the reasons discussed above in relation to Claim

28  One.

**Claim Six**

In Claim Six, Blake contends that his conviction and death sentence are in violation of his constitutional rights due to various instances of prosecutorial misconduct. Claims Six(A, B, D, and E) are procedurally defaulted, leaving Claims Six(C) for a decision on the merits.

In Claim Six(C), Blake alleges that the prosecutor committed misconduct worthy of habeas relief "by asking the jury to sentence [him] to death as an expression of societal outrage and to deter future crime." ECF No. 124, p. 224. As part of his closing argument, the prosecutor stated as follows:

> The reasons for the death penalty. First and foremost, the death penalty is to punish. The death penalty can be viewed as society's expression of outrage. *Society is angry for someone to have misbehaved in a horribly atrocious manner.* …

> [Defense counsel's objection to reference to "society" overruled.]

> Society allows punishment. We as parents we punish our children. Teachers punish their students. In the case of murder, juries punish criminal defendants. Punishment achieves a necessary goal in our society. It's okay to punish. It's okay to tell somebody you've done something horribly wrong, and you have to pay the consequences of. *If we do not punish appropriately, we are sowing the seeds of anarchy.* The key, the absolute key to punishment is that it fit the crime. So the more egregious the crime, the more egregious the punishment ought to be.

> *Another reason for the death penalty is deterrents* [sic]*, the deterrent effect it will have on future crime. Common sense tells you that violent crime is deterred by the imposition of harsh punishment. When the death penalty is imposed, it becomes a news item. People hear about it in our schools, in our communities, in our neighborhoods who hear about this and there very well might be one among them who decides he's not going to carry a gun with him or a knife with him when he commits a crime. He very well might decide he is not going to kill somebody because of the harshness of punishment.*

> What will the imposition of a death penalty do in this case? Will it bring back Sophear or [Sheila]? No. Will it bring an absolute end to violence in our society? No. *Could the imposition of the death penalty save innocent life in the future by the message it sends? Quite possibly. Will the imposition of the death penalty guarantee that Alfonso Blake never kills again? Most certainly.*

ECF No. 42-6, p. 14 (comments cited as improper by Blake in italics).

"Improper argument does not, per se, violate a defendant's constitutional rights." *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993) (citations omitted). Habeas corpus relief is available on grounds of improper argument only when the "prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*,

477 U.S. at 171 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Relief will be granted when the prosecutorial misconduct amounts to constitutional error, and such error is not harmless under the test announced in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), which asks whether the error had a substantial and injurious effect in determining the verdict. *See Fields v. Woodford*, 309 F.3d 1095, 1109, *amended* 315 F.3d 1062 (9th Cir. 2002).

Blake raised his prosecutorial misconduct argument on direct appeal, focusing on the first, second, and fourth paragraphs excerpted above, but not mentioning the third. ECF No. 43-19 at 28-32. The Nevada Supreme Court decided as follows:

> Blake claims that the State committed prosecutorial misconduct during the penalty phase of his trial. "To determine if prejudicial prosecutorial misconduct occurred, the relevant inquiry is whether a prosecutor's statements so infected the proceedings with unfairness as to make the results a denial of due process."[25] However, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be reviewed in context."[26]
>
> First, Blake contends that the prosecutor improperly commented on, over his objection, community standards with statements such as the following: "The death penalty can be viewed as society's expression of outrage," and "[p]unishment achieves a necessary goal in our society." We conclude that these statements were not improper. "[A] prosecutor in a death penalty case properly may ask the jury, through its verdict, to set a standard or make a statement to the community."[27] And a prosecutor may properly discuss "general theories of penology such as the merits of punishment, deterrence and the death penalty."[28]
>
> Next, Blake asserts that the following argument improperly commented on his propensity to commit further crimes:
>
> > What will the imposition of the death penalty do in this case? Will it bring back Sophear or [Sheila]? No. Will it bring an absolute end to violence in our society? No. Could the imposition of the death penalty save innocent life in the future by the message it sends? Quite possibly. Will the imposition of the death penalty guarantee that Alfonso Blake never kills again? Most certainly.
>
> Counsel did not object to these comments. Absent objection, generally an appellant must establish that the assigned error was plain and affected his substantial rights.[29] However, NRS 177.055(2)(d) requires this court to consider whether a death penalty has been imposed "under the influence of passion, prejudice or any arbitrary factor." Therefore, we consider whether the challenged remarks were improper and influenced the jury's sentencing decision.[30]
>
> Prosecutors may argue that a defendant poses a future danger where the evidence supports such an argument, but prosecutors cannot argue that the jury must either return a death sentence or take responsibility for the death of a future victim. As we have explained, "[a] prosecutor may still argue that the defendant, if not executed, will pose a threat to the lives of others in the future or that he will

kill again. What are prohibited are arguments which, directly or by implication, place responsibility on the jury for the deaths of unknown future victims."[31] We have condemned, for example, a prosecutor's argument to jurors that "whatever the decision is, you will be imposing a judgment of death and it's just a question of whether it will be an execution sentence" for the defendant or for the defendant's future victim.[32]

We conclude that the challenged comments here were proper. The prosecutor suggested that Blake could kill again but did not argue that such a killing was certain or that the jury would bear responsibility for it.

---

[25] *Thomas v. State*, 120 Nev. 37, 47, 83 P.3d 818, 825 (2004) (citing *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)).

[26] *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *see Hernandez* [*v. State*, 118 Nev. 513, 525, 50 P.3d 1108 (2002)]; *Steese v. State*, 114 Nev. 479, 496, 960 P.2d 321, 332 (1998).

[27] *Williams v. State*, 113 Nev. 1008, 1020, 945 P.2d 438, 445 (1997); *see Schoels v. State*, 114 Nev. 981, 987, 966 P.2d 735, 739 (1998), *rehearing granted on other grounds*, 115 Nev. 33, 975 P.2d 1275 (1999).

[28] *Witter v. State*, 112 Nev. 908, 924, 921 P.2d 886, 897 (1996); *see Evans v. State*, 117 Nev. 609, 632, 28 P.3d 498, 514 (2001).

[29] *See* NRS 178.602; *Gallego* [*v. State*, 117 Nev. 348, 365, 23 P.3d 227, 239 (2001)].

[30] *Butler v. State*, 120 Nev. 879, ——, 102 P.3d 71, 85 (2004).

[31] *Schoels*, 114 Nev. at 988–89, 966 P.2d at 740; *see also Castillo v. State*, 114 Nev. 271, 279, 956 P.2d 103, 109 (1998).

[32] *Castillo*, 114 Nev. at 279–80, 956 P.2d at 109.

*Blake*, 121 P.3d at 578–79.

Blake argues that the Nevada Supreme Court unreasonably applied the precedent established in *Viereck v. United States*, 318 U.S. 236 (1943), and followed by the Ninth Circuit in *United States v. Koon*, 34 F.3d 1416 (9th Cir. 1994). In *Viereck*, the Supreme Court reversed the defendant's conviction due to an erroneous jury instruction, but also addressed, in dicta, the prosecutor's closing remarks to the jury "at a time when passion and prejudice are heightened by emotions stirred by our participation in a great war." 318 U.S. at 247-48. With those remarks, the prosecutor told the jury:

In closing, let me remind you, ladies and gentlemen, that this is war. This

1
2
> is war, harsh, cruel, murderous war. There are those who, right at this very
> moment, are plotting your death and my death; plotting our death and the death of
> our families because we have committed no other crime than that we do not agree
> with their ideas of persecution and concentration camps.

3
4
5
> This is war. It is a fight to the death. The American people are relying
> upon you ladies and gentlemen for their protection against this sort of a crime,
> just as much as they are relying upon the protection of the Men who man the guns
> in Bataan Peninsula, and everywhere else. They are relying upon you ladies and
> gentlemen for their protection. We are at war. You have a duty to perform here.

6
7
> As a representative of your Government I am calling upon every one of
> you to do your duty.

8    *Id.* at 247 n. 3. The Court held that the remarks were "highly prejudicial, and that they were

9    offensive to the dignity and good order with which all proceedings in court should be

10   conducted." *Id.* at 248.

11   The court in *Koon* cited *Viereck* for the proposition that "prosecutors may not make

12   comments calculated to arouse the passions or the prejudices of the jury." *Koon*, 34 F.3d at 1443

13   (citing *Viereck*, 318 U.S. at 247-48). The court also quoted the following excerpt from the D.C.

14   Circuit:

15
16
17
18
19
> A prosecutor may not urge jurors to convict a criminal defendant in order
> to protect community values, preserve civil order, or deter future lawbreaking.
> The evil lurking in such prosecutorial appeals is that the defendant will be
> convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may
> be persuaded by such appeals to believe that, by convicting a defendant, they will
> assist in the solution of some pressing social problem. The amelioration of
> society's woes is far too heavy a burden for the individual criminal defendant to
> bear.

20   *Id.* (quoting *United States v. Monaghan*, 741 F.2d 1434, 1441 (D.C. Cir. 1984)). The court held

21   that some of the prosecutor's "references to public outrage could easily incite the passions, fears,

22   and prejudices of the jurors, remind them of the social ramifications of their verdict, and

23   persuade them to convict the defendants for reasons irrelevant to appellants' guilt," but that they

24   did not constitute plain error. *Id.* at 1445.

25   Blake argues that the Nevada Supreme Court contravened clearly established federal law

26   because *Viereck* and *Koon* establish that a prosecutor may not ask the jury to send a message to

27   the community or cure a social problem with its verdict, but the Nevada Supreme Court

28   concluded the prosecutor's remarks were "not improper" because a "prosecutor in a death

penalty case properly may ask the jury, through its verdict, to set a standard or make a statement to the community." ECF No. 172 at 172. This argument is not convincing.

The court in *Koon* noted that "[a]n appeal to the jury to be the conscience of the community is not impermissible unless it is 'specifically designed to inflame the jury.'" *Koon*, 34 F.3d at 1444 (quoting *United States v. Williams*, 989 F.2d 1061, 1072 (9th Cir. 1993) (internal quotations omitted); *United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir. 1984)). The prosecutor's remarks in *Viereck* were plainly intended to appeal to the passions of the jury and invited the jury to convict for reasons unrelated to the defendant's guilt or innocence. Here, by contrast, nothing about the prosecutor's remarks in this case suggest that they were "designed to inflame the jury." And, unlike the comments in *Viereck*, they did not suggest to the jury that it had "a direct stake in the outcome of the case" or that the community-at-large was relying upon it to reach a certain verdict. *Id*.

As for the other comments Blake cites, they are also not grounds for habeas relief. A prosecutor in the penalty phase of a capital trial is permitted to discuss the defendant's future dangerousness. *See Simmons v. South Carolina*, 512 U.S. 154, 163 (1994). As the Nevada Supreme Court noted, the prosecutor did not state or suggest that the jury would bear the responsibility for future victims if it did not sentence Blake to death. Similarly, to the extent the prosecutor's isolated comments about the deterrence effect of the death penalty may have been improper, they were not so egregious that they resulted in a denial of due process.

In summary, the Nevada Supreme Court's denial of Blake's prosecutorial misconduct claim was not contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Claim Six is denied.

**Claim Seven**

In Claim Seven, Blake contends that his conviction and death sentence are in violation of his constitutional rights due to various instances of trial court error.

*Claim Seven(A)*

In Claim Seven(A), Blake alleges that the trial court unconstitutionally limited his affirmative defenses. This claim is premised on the trial court's ruling that it would not issue a

jury instruction on legal insanity unless Blake committed to an insanity plea prior to trial. According to Blake, the ruling forced him to commit to a theory of defense prior to having the benefit of hearing the evidence in the case.

Addressing the issue on direct appeal, the Nevada Supreme Court held as follows:

> Blake claims that the district court committed constitutional error by forcing him to plead not guilty by reason of insanity. We disagree.
>
> Twenty-one days before the trial began Blake filed a "reservation" of his right to plead not guilty by reason of insanity pursuant to NRS 194.010(3). At trial, just before jury selection, the State requested the district court to inquire whether Blake intended to plead not guilty by reason of insanity so that the State could arrange for its expert psychiatrist to evaluate Blake. Defense counsel responded that forcing him to enter a plea of not guilty by reason of insanity at that time deprived him of other defenses, particularly those set forth in NRS 194.010(4) and (5).
>
> The district court disagreed and informed counsel that Blake had to indicate whether he intended to proceed with a plea of not guilty by reason of insanity but that he would be allowed to argue the defenses set forth in NRS 194.010. Blake then entered a plea of not guilty by reason of insanity.
>
> Blake argues that the district court's ruling was erroneous because he complied with the statutory requirements of NRS 174.035(4) by reserving his right to plead not guilty by reason of insanity. We disagree. NRS 174.035(4) clearly requires that such a plea "be entered not less than 21 days before the date set for trial." Reserving the right to enter a plea is not equivalent to entering a plea. Therefore, Blake actually received an additional 21 days to decide his plea without being required to show good cause.
>
> We further consider unpersuasive Blake's argument that compelling him to enter a plea of not guilty by reason of insanity prejudiced his counsel's ability to present a defense and deprived him of his constitutional right to a fair trial. The jury received instructions regarding self-defense, defenses pursuant to NRS 194.010(4) and (5), and the lesser-included offenses of second-degree murder and voluntary manslaughter, as well as insanity. Additionally, counsel addressed these theories in closing argument. Accordingly, we deny relief on this basis.

*Blake*, 121 P.3d at 575 (footnotes omitted).

Blake contends that the Nevada Supreme Court's decision was "contrary to" and an "unreasonable application" of clearly established federal law as determined by the Supreme Court. He does not, however, identify the federal law that the state court's decision contravened. The absence of clearly established Supreme Court law supporting Blake's position means this court must defer to the state court's decision. *See* 28 U.S.C. § 2254(d)(1); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008); *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

Claim Seven(A) is without merit and is denied.

*Claim Seven(D1)*

In Claim Seven(D1), Blake alleges that the trial court violated the constitution by failing to remove a biased juror for cause (D1.1) and by failing to prevent the use of peremptory strikes against death-scrupled jurors (D1.3). With respect the former claim, Blake points to the voir dire of William Allmon, wherein Almon indicated that he had already concluded that Blake was guilty based on what he heard about the crime in the media. The trial court denied Blake's challenge for cause, which resulted in Blake using one of his peremptory challenges to remove Allmon. According to Blake, his use of a peremptory challenge on Allmon meant that he could not use one to remove Teresa Bullock, a seated juror who, as the victim of a home invasion and sexual assault, was a biased juror.

Addressing the issue on direct appeal, the Nevada Supreme Court held as follows:

> Blake argues that the district court erroneously denied his challenge for cause against a prospective juror, depriving him of his right to due process of law in violation of the Fifth, Sixth, and Fourteenth Amendments. Specifically, he contends that the veniremember's answers to voir dire questions demonstrated that he had already determined Blake's guilt. We disagree.

> NRS 16.050(1)(f) provides that a challenge for cause may be taken when a prospective juror has "formed or expressed an unqualified opinion or belief as to the merits of the action, or the main question involved therein; but the reading of newspaper accounts of the subject matter before the court shall not disqualify a juror either for bias or opinion." Clearly, a qualified juror need not be completely unaware of the facts and issues of the case at hand. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard."[19] Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."[20] Because such rulings involve factual determinations, the district court enjoys broad discretion in ruling on challenges for cause.[21]

> The veniremember stated that based on media reports, he believed that Blake committed the murders. However, he did not express that his opinion was "unqualified." After further colloquy between the veniremember and defense counsel and the prosecutor, the veniremember unequivocally stated that he could set aside what he had seen and heard about the case, and he twice stated that he could render a decision based on the evidence presented at trial.[22] Based on the record, we conclude that the district court did not abuse its discretion in denying Blake's challenge for cause against the prospective juror.

> Nonetheless, even assuming error, we reject Blake's contention that the district court's denial of his challenge for cause deprived him of any constitutional

rights by requiring him to utilize one of his peremptory challenges. Peremptory challenges "are a means to achieve the end of an impartial jury."[23] If the jury actually seated is impartial, the fact that a defendant had to use a peremptory challenge to achieve that result does not mean that the defendant was denied his right to an impartial jury.[24] Although Blake exhausted his peremptory challenges, he does not argue that any juror actually empanelled was unfair or biased. Therefore, even if the district court improperly denied his challenge for cause, because Blake exercised a peremptory challenge to remove the veniremember and because he has not shown that any juror actually empanelled was unfair or biased, we conclude that he has not demonstrated any error of constitutional dimension.

---

[19] *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

[20] *Id.*

[21] *Leonard v. State*, 117 Nev. 53, 67, 17 P.3d 397, 406 (2001).

[22] *See Snow v. State*, 101 Nev. 439, 445–46, 705 P.2d 632, 637–38 (1985).

[23] *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

[24] *Id.*; *see also Hernandez v. State*, 118 Nev. 513, 533–34 & n. 53, 50 P.3d 1100, 1114 & n. 53 (2002).

*Blake*, 121 P.3d at 577–78.

This court does not necessarily agree that the trial court did not abuse its discretion by not granting counsel's challenge for cause. It appears from the transcript that the trial court denied the challenge before most of the "further colloquy" to which the Nevada Supreme Court refers. ECF No. 40-8 at 6-7. Nonetheless, the Nevada Supreme Court correctly cited *Ross* as controlling the outcome even if Blake was required to use a peremptory challenge to dismiss Allmon rather than have him removed for cause.

In *Ross*, the Court stated:

> We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

*Ross*, 487 U.S. at 88 (1988) (citations omitted). Thus, while the Constitution guarantees a defendant the right to an impartial jury, the fact that a defendant is required to use a peremptory challenge to cure a trial court's error in denying a challenge for cause does not constitute a constitutional violation. The Court in *Ross* also rejected petitioner's argument that he was

1  deprived of his Fourteenth Amendment right to due process because the trial court's erroneous

2  challenge-for-cause ruling deprived him of the full complement of peremptory challenges

3  allowed under state law. *Id*. at 89. "[B]ecause no member of the jury as finally composed was

4  removable for cause, [the Court] found no violation of Ross's Sixth Amendment right to an

5  impartial jury or his Fourteenth Amendment right to due process." *Rivera v. Illinois*, 556 U.S.

6  148, 158, (2009) (citing *Ross*, 487 U.S. at 86-91); *see also United States v. Martinez-Salazar*,

7  528 U.S. 304, 307 (2000) (holding that that "if the defendant elects to cure [trial court] error by

8  exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased

9  juror sat, he has not been deprived of any . . . constitutional right").

10      Blake faults the Nevada Supreme Court for not addressing "the fact that trial counsel's

11  use of a peremptory strike on Allmon precluded trial counsel from striking Bullock. Blake did

12  not, however, include his allegation about Bullock in his argument to the Nevada Supreme

13  Court. ECF No. 43-19 at 20-24. Moreover, Blake has not shown that Bullock was an impartial

14  juror. She did state, as Blake alleges, that she had been the victim of a sexual assault and a home

15  invasion (ECF No. 40-7 10), but Blake was not accused of either. In addition, she also stated that

16  the incident occurred "in the 70s, quite a while ago" and that she would be able consider all of

17  the available sentences. *Id*.

18      Blake's claim regarding the use of peremptory strikes against death-scrupled jurors is

19  also without merit. (D1.3). Relying primarily on *Witherspoon v. Illinois*, 391 U.S. 510 (1968), he

20  contends that the trial court violated his constitutional rights by denying of his motions to

21  prohibit the use of peremptory challenges to exclude jurors who express concerns about the death

22  penalty and to require the prosecutor to state reasons for exercising peremptory challenges. The

23  Nevada Supreme Court rejected this claim on direct appeal. *Blake*, 121 P.3d at 580.

24      The Court in *Witherspoon* was addressing the prosecution's use of selective challenges

25  for cause to tilt the jury in favor of capital punishment. *Witherspoon*, 391 U.S. at 521. There are

26  no Supreme Court cases limiting a prosecutor's use of peremptory challenges on prospective

27  jurors expressing reservations about the death penalty.  The absence of clearly established

28

Supreme Court law means this court must defer the state court's decision. See 28 U.S.C. § 2254(d)(1); *Van Patten*, 552 U.S. at 126; *Musladin*, 549 U.S. at 77.

Because he has not shown that a biased or unqualified juror served on his jury, Blake has not shown that his voir dire did not meet constitutional requirements. *See Skilling*, 561 U.S. at 395 n.31 (citing *Martinez-Salazar*, 528 U.S. at 307). Claim Seven(D1) is denied.

### Claim Seven(E)

In Claim Seven(E), Blake alleges that the trial court violated the constitution by allowing the State to ask the jury to sentence him to death as an expression of societal outrage and to deter future crime. As discussed above in relation to Claim Six, the prosecutor's comments did not amount to constitutional error. Claim Seven(E) is denied.

### Claim Seven(G)

In Claim Seven(G), Blake alleges the trial court violated the constitution by not allowing Blake to present demonstrative evidence during closing argument in the penalty phase. Specifically, the trial court refused to allow Blake's counsel to display photographs of a prison cell and a lethal injection bed. According to Blake, the trial court's ruling was prejudicial error. The Nevada Supreme Court rejected this claim on direct appeal. *Blake*, 121 P.3d at 580.

Evidentiary rulings are matters of state law that do not support federal habeas relief. *Estelle v. McGuire*, 502 U.S. at 67-68; *see also Pulley v. Harris*, 465 U.S. 37 (1984). In addition, there are no Supreme Court cases addressing an alleged constitutional violation arising from a trial court's exclusion of demonstrative evidence during closing argument.  The absence of clearly established Supreme Court law means this court must defer the state court's decision. *See* 28 U.S.C. § 2254(d)(1); *Van Patten*, 552 U.S. at 126; *Musladin*, 549 U.S. at 77. Claim Seven(G) is denied.

### Claim Seven(J)

In Claim Seven(J), Blake alleges that the trial court improperly denied his motions requesting death penalty data and preventing the striking of death-scrupled jurors. Blake cites the trial court's denial of his motions for discovery and evidentiary hearing regarding the manner and method of determining in which murder case the death penalty will be sought, to preclude

questioning of jurors in voir dire regarding the death penalty, and to compel the prosecutor to disclose death penalty data.[4]

Again, Blake relies on *Witherspoon* to support his claim. There is no reading of *Witherspoon*, however, that compels a finding that the trial court violated Blake's constitutional right by denying the motions at issue. Claim Seven(J) is denied.

*Claim Seven(K)*

In Claim Seven(K), Blake alleges that the trial court's errors, considered cumulatively, were prejudicial and had a substantial and injurious effect or influence in determining the jury's verdict. In the absence of any argument as to how the prejudicial impact of any alleged trial court error was increased when combined with other alleged errors, the claim is denied.

**Claim Eight**

In Claim Eight, Blake contends that his death sentence is in violation of his constitutional rights because the aggravating factor that "the murder was committed to avoid or prevent lawful arrest" is vague and overbroad. He argues that, as applied by the Nevada courts, the aggravating circumstance violates the Ex Post Facto Clause and the Fourteenth Amendment's Due Process Clause because it imposes liability based on "an unanticipated and irrational broadening of the statutory language." ECF No. 124 at 257. He further argues that the factor is inherent in every murder and, therefore, fails to genuinely narrow the class of defendants eligible for the death penalty. In addition, he claims that the factor violates the presumption of innocence and the due process requirement that the State prove the elements of the charged offense because it does not require the any evidence of motive – that is, it places the burden on the defendant to prove some motive other than avoiding arrest.

In Blake's direct appeal, the Nevada Supreme Court rejected his arguments challenging the "avoid lawful arrest" aggravating circumstance. *Blake*, 121 P.3d at 576–77. In particular, the court declined to overturn its prior holdings and "apply a more restrictive interpretation" of the

---

[4] The denial of Blake's motions to prohibit use of peremptory challenges to exclude jurors who express concerns about the death penalty and to require the prosecutor to state reasons for exercising peremptory challenges are addressed in the discussion of Claim 7(D1.3), above.

aggravator. *Id*. While the court did not address most of the arguments Blake presents in his federal petition, the Ninth Circuit did in a case decided after the parties' briefing of the issues.

In *Williams v. Filson*, 908 F.3d 546 (9th Cir. 2018), the Ninth Circuit held as follows:

> In Claim 16, Williams challenges the constitutional validity of the "avoid lawful arrest" aggravating circumstance, one of the four aggravators originally found by the three-judge sentencing panel. At the time of Williams' trial, that aggravating circumstance required the State to prove that "[t]he murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." Nev. Rev. Stat. § 200.033(5) (1981). The State's theory in this case was that Williams murdered Ms. Carlson to avoid and prevent his lawful arrest for the burglary of the Carlsons' home. The sentencing judges found sufficient evidence to support that theory. Williams argues that Nevada's avoid-lawful-arrest aggravating circumstance is facially invalid under the Eighth Amendment both because it is too vague and because it fails to adequately narrow the class of death-eligible defendants. He further argues that, as applied to him, the aggravating circumstance violates the Ex Post Facto Clause and the Fourteenth Amendment's Due Process Clause because he lacked adequate notice at the time he committed the offense that § 200.033(5) could be applied to the facts of his crime. We do not find these contentions meritorious, even reviewing the merits of Claim 16 de novo.
>
> We turn first to Williams' Eighth Amendment arguments. He contends that, read most sensibly, § 200.033(5) should be understood to apply only when the defendant's arrest is truly imminent, as when a defendant murders a police officer attempting to take the defendant into custody. The parties agree that the Nevada Supreme Court has rejected that reading of the aggravator. *See Evans v. State*, 112 Nev. 1172, 926 P.2d 265, 280 (1996); *Cavanaugh v. State*, 102 Nev. 478, 729 P.2d 481, 486 (1986). In Williams' view, rather than adopt his sensible construction of § 200.033(5), the Nevada Supreme Court has instead read it to apply whenever a defendant murders the victim to prevent her from serving as a witness who could later identify the defendant. The problem with that reading, Williams asserts, is that the aggravating circumstance would apply in virtually every murder case, since the victim of any murder could always be a witness if allowed to live. Read that broadly, the aggravating circumstance would likely violate the Eighth Amendment, for the Supreme Court has held that aggravating circumstances must "genuinely narrow the class of persons eligible for the death penalty." *Romano v. Oklahoma*, 512 U.S. 1, 7, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (internal quotation marks omitted). Stated differently, an aggravating circumstance "may not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder." *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).
>
> The Nevada Supreme Court, however, has construed § 200.033(5) more narrowly than Williams suggests. We have found no case in which the court adopted the broad, constitutionally problematic reading that Williams posits. Instead, the Nevada Supreme Court has upheld application of the aggravating circumstance only when the State has proved that the defendant committed murder for the purpose of preventing the victim from serving as a witness to some antecedent crime (separate from the murder) that the defendant committed. *See, e.g., Jeremias v. State*, —— Nev. ——, 412 P.3d 43, 55 (2018); *Blake v. State*, 121 Nev. 779, 121 P.3d 567, 577 (2005); *Domingues v. State*, 112 Nev. 683, 917 P.2d 1364, 1375–77 (1996); *Cavanaugh*, 729 P.2d at 486. That is the same limiting

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

construction other States have adopted for their own, similarly worded avoid-lawful-arrest aggravators. *See, e.g., Thompson v. State*, 648 So.2d 692, 695 (Fla. 1994) (per curiam); *People v. Davis*, 794 P.2d 159, 187 n.22 (Colo. 1990), *overruled on other grounds by People v. Miller*, 113 P.3d 743 (Colo. 2005). We agree with the Eighth and Tenth Circuits that such a limiting construction adequately narrows the class of defendants rendered eligible for the death penalty. *See Davis v. Executive Director of the Department of Corrections*, 100 F.3d 750, 769 (10th Cir. 1996); *Wainwright v. Lockhart*, 80 F.3d 1226, 1231 (8th Cir. 1996).

Williams next contends that the Nevada Supreme Court has inconsistently applied this limiting construction, such that the avoid-lawful-arrest aggravator is unconstitutionally vague. According to Williams, the Nevada Supreme Court has upheld application of the circumstance in some cases involving a defendant who murdered the victim after committing an antecedent crime, but has arbitrarily rejected application of the circumstance in other cases with the same facts. We do not read the cases as exhibiting this kind of arbitrariness in application. What they demonstrate is that the Nevada Supreme Court requires the State to produce evidence from which the factfinder can reasonably infer that the defendant committed the murder for the purpose of eliminating the victim as a witness for an antecedent crime. Where such proof exists, the court has upheld application of the aggravating circumstance. *See, e.g., Randolph v. State*, 117 Nev. 970, 36 P.3d 424, 437 (2001); *Cavanaugh*, 729 P.2d at 486. And where the court viewed such proof as lacking, it has rejected application of the circumstance. *See, e.g., Witter v. State*, 112 Nev. 908, 921 P.2d 886, 900 (1996), *overruled on other grounds by Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000); *Jimenez v. State*, 105 Nev. 337, 775 P.2d 694, 698 (1989). None of these factbound decisions renders the avoid-lawful-arrest aggravating circumstance unconstitutionally vague.

Williams makes one final argument that warrants discussion. He notes that, at the time he committed his offense, the Nevada Supreme Court had not yet held that § 200.033(5) could be applied in a case like his, involving the murder of a witness, as opposed to someone actually involved in effectuating the defendant's arrest. The court first upheld application of the aggravating circumstance in a case involving the murder of a witness more than four years after Williams' offense, in *Cavanaugh v. State*, 102 Nev. 478, 729 P.2d 481 (1986). Williams argues that he lacked fair notice that the avoid-lawful-arrest aggravator could be applied to the facts of his case, and that any attempt to uphold application of the aggravator based on the Nevada Supreme Court's subsequent interpretation of it would violate the Ex Post Facto Clause.

Judicial interpretation of a criminal statute may not be applied retroactively if the court's decision is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Bouie v. City of Columbia*, 378 U.S. 347, 354, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). We cannot say that the Nevada Supreme Court's interpretation of § 200.033(5) constitutes an "unexpected and indefensible" break with prior Nevada law. Williams has identified no pre-*Cavanaugh* authority from Nevada courts that is inconsistent with the rule *Cavanaugh* adopted, and we have found none. Indeed, *Cavanaugh*'s interpretation of § 200.033(5) accords with a 1978 decision from the Florida Supreme Court interpreting a nearly identical statute, which indicates that the interpretation adopted by the Nevada Supreme Court in *Cavanaugh* reflects a reading of the provision's text that could reasonably have been expected. *See Riley v. State*, 366 So.2d 19, 22 (Fla. 1978).

*Williams*, 908 F.3d at 575-77 (footnote omitted).

The only argument not addressed in *Williams* is Blake's contention that the aggravator violates the presumption of innocence by placing the burden of proof on him to show that he killed the victims for a motive other than wishing to prevent a lawful arrest. As noted in *Williams*, however, the State was required to prove that Blake "committed murder for the purpose of preventing the victim from serving as a witness to some antecedent crime (separate from the murder) that the defendant committed." *Williams*, 908 F.3d at 576. The State did so by presenting evidence from which jurors could reasonably infer that Blake killed his victims because they had witnessed his assault on Sophear Choy.

Claim Eight is denied.

**Claim Nine**

In Claim Nine, Blake contends that his conviction and death sentence are in violation of his constitutional rights due to erroneous jury instructions. As noted above, the claim is dismissed as procedurally defaulted except for the allegations in Claim Nine(A)(ii) and Claim Nine(F).

In Claim Nine(A)(ii), Blake alleges trial counsel were ineffective for proffering insanity instructions without presenting any evidence to support a valid insanity defense. This claim is without merit for the reasons discussed above in relation to Claim Three.

In Claim Nine(F), Blake alleges the trial court violated his constitutional rights be failing to give his requested presumption of innocence instruction to the jury. The instruction at issue provided, in part, that:

> The Defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime and that the Defendant is the person who committed the offense.

ECF No. 42-2 at 9. At trial, Blake's counsel unsuccessfully argued that the word "until" should be replaced with "unless." Blake now contends that the trial court's rejection of that argument impermissibly shifted the burden proof in violation of his right to a fair trial.

Addressing the issue on direct appeal, the Nevada Supreme Court held as follows:

> Blake further contends that, over his objection, the district court provided

an inadequate jury instruction concerning the presumption of innocence. The challenged instruction tracked the language of NRS 175.191 and provided in part: "The Defendant is presumed innocent until the contrary is proved." Blake argues that the word "until" nullified the presumption of innocence by implying that his guilt would eventually be proven beyond a reasonable doubt. However, read as a whole, the instruction did not imply this. The instruction also defined reasonable doubt in accordance with NRS 175.211 and concluded: "If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty." The instruction plainly contemplated that guilt might not be proven. Accordingly, we deny relief on this basis.

*Blake*, 121 P.3d at 580.

Federal habeas courts do not grant relief simply because an instruction may have been deficient. *Estelle v. McGuire*, 502 U.S. at 72. The question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly*, 416 U.S. at 643 ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right]'"). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. at 147). In addition, in reviewing the instruction, the court must inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. *Boyde v. California*, 494 U.S. 370, 380 (1990). Even if constitutional instructional error has occurred, the federal court must still determine whether petitioner suffered actual prejudice, that is, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

Read in conjunction with the trial court's other instructions on presumption of innocence and proof beyond a reasonable doubt, the Nevada Supreme Court's determination that the instruction did not violate Blake's right to due process was not unreasonable under AEDPA. *See* 28 U.S.C. § 2254(d)(1). The claim is denied.

In Claim Nine(I), Blake alleges that he is entitled to habeas relief due the cumulative effect of erroneous jury instructions. In the absence of a showing that any of the trial court's jury instruction were erroneous, this claim is denied.

**Claim Twelve**

1    In Claim Twelve, Blake contends that his conviction and death sentence are in violation

2 of his constitutional right effective assistance of counsel on direct appeal. In Claim Twelve(A),

3 he alleges that he received ineffective assistance of appellate counsel due to a conflict of interest.

4 To support the claim, he alleges that the Public Defender's Office notified the trial court that it

5 could not represent him, but later accepted appointment despite the conflict.

6    Blake presented his conflict of interest claim in his first state habeas proceeding. On

7 appeal, the Nevada Supreme Court addressed the claim as follows:

8        Blake contends that the district court erred by summarily denying his
       claim that he received ineffective assistance of appellate counsel due to a conflict
9       of interest.

10       The submissions before this court reveal that prior to trial, a representative
       from the Public Defender's Office advised the district court that the office could
11      not represent Blake due to a conflict because the office had represented some of
       the witnesses in Blake's case. Subsequently, after Blake's trial and penalty
12      hearing, the district court inquired whether a conflict with the Public Defender's
       Office still existed. A Deputy Public Defender responded that after reviewing the
13      list of witnesses, there did not appear to be a conflict. The district court then
       appointed the Public Defender's Office to represent Blake at sentencing on the
14      attempted murder and on appeal. Blake failed to identify the witnesses who were
       apparently the source of the conflict, their relevance to the case, or why the Public
15      Defender's Office's apparent association with them created a conflict of interest,
       particularly given the nature of the proceeding in which the office represented
16      Blake. *See* RPC 1.7. Because Blake failed to adequately substantiate this claim to
       warrant an evidentiary hearing, we conclude that the district court did not err by
17      denying this claim. *Hargrove v. State*, 100 Nev. 498, 502-03, 686 P.2d 222, 225
       (1984).
18

19 ECF No. 46-12 at 9-10.

20    The Nevada courts' factual findings are entitled to a presumption of correctness. 28

21 U.S.C. § 2254(e)(1). Blake contends argues the state court's findings were unreasonable because

22 the fact-finding procedure was not adequate without an evidentiary hearing. He fails to identify,

23 however, an issue requiring an evidentiary hearing to resolve given the Public Defender's

24 office's assurance that no conflict existed. *Cf. Houston v. Schomig*, 533 F.3d 1076, 1082–83 (9th

25 Cir. 2008) (evidentiary hearing necessary to determine counsel's tactical reasons, if any, for not

26 attempting to vigorously impeach former client of counsel's office). Blake has not established

27 that the Nevada Supreme Court's denial of his claim contravened clearly established federal law

28 or that it was based on an unreasonable determination of the facts in light of the evidence

presented in state court. Thus, Claim Twelve (A) is without merit.

In Twelve(B), Blake alleges that appellate counsel was ineffective by failing to argue the claims now raised in his federal habeas petition. In deciding respondents' motion to dismiss, this court determined that Claim Twelve(B) is procedurally defaulted, but gave Blake the opportunity to demonstrate that the default of the IAC claim should be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012). Since then, the Supreme Court confirmed that *Martinez* is confined to defaulted claims of ineffective assistance of trial counsel and declined to extend the holding to defaulted claims of ineffective assistance of appellate counsel. *See Davila v. Davis*, 137 S.Ct. 2058, 2070 (2017). Thus, the default of Claim Twelve(B) may not be excused under *Martinez*. In the absence of a convincing showing that the default should otherwise be excused, Claim Twelve(B) is dismissed.

**Claim Fourteen**

In Claim Fourteen, Blake alleges that his death sentence is invalid because execution by lethal injection is cruel and unusual punishment. Claim Fourteen(A) alleges numerous defects and deficiencies in Nevada's lethal injection procedure. Claim Fourteen(B) asserts that Nevada's lethal injection protocol is unconstitutional under *Baze v. Rees*, 553 U.S. 35 (2008). Claim Fourteen fails for at least two reasons.

First, current authority suggests that Blake's lethal injection challenge is not cognizable in a habeas proceeding and must, instead, be brought as civil rights action under 42 U.S.C. §1983 rather. *See Glossip v. Gross*, 576 U.S. 863 (2015); *Hill v. McDonough*, 547 U.S. 573 (2006); *Nelson v. Campbell*, 541 U.S. 637 (2004); *Beardslee v. Woodford*, 395 F.3d 1064 (9th Cir. 2005). In both *Nelson* and *Hill*, the Supreme Court condoned a complaint under § 1983 as an appropriate vehicle for a method-of-execution claim. The Court's reasoning in both cases was that plaintiff's action, if successful, would not invalidate the plaintiff's sentence because the State could use an alternative constitutional method to implement the sentence. *Hill*, 547 U.S. at 579-80; *Nelson*, 541 U.S. at 645-46. Later, in *Glossip*, the Supreme Court characterized its holding in *Hill* as requiring a method-of-execution claim to "be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence." *Glossip*,

576 U.S. at 879 (citing *Hill*, 547 U.S. at 579-80).[5]

Second, Nevada's lethal injection procedure and protocol are subject to change and have changed since Blake filed his second amended habeas petition. At this point, there is no way to determine what drugs or protocol Nevada would attempt to use to execute Blake. A court "cannot adjudicate the constitutionality of an unknown protocol." *Floyd v. Filson*, 949 F.3d 1128, 1152 (9th Cir. 2020). Thus, Claim Fourteen is not yet ripe for federal review. *See id.*

Claim Fourteen is denied.

IV.  CONCLUSION

For the reasons set forth above, Blake is not entitled to habeas relief. Also, having concluded that none of Blake's procedurally-defaulted ineffective assistance of trial counsel claims meet the *Strickland* standard, the court declines to address whether Blake's procedural default of those claims can be excused under *Martinez*.

*Certificate of Appealability*

Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

---

[5] In a more recent case, *Bucklew v. Precythe*, 139 S.Ct. 1112 (2019), the Court addressed the standards that apply to § 1983 claims challenging methods of execution.

1        The COA standard is not high.  Blake must only "'sho[w] that reasonable jurists could

2   debate'" the district court's resolution or that the issues are "'adequate to deserve encouragement

3   to proceed further.'"  *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc)

4   (citations omitted).  Having reviewed its determinations and rulings in adjudicating Blake's

5   petition, the court concludes that the *Slack* standard is met with respect to the court's resolution

6   of Claim Four, above. The court therefore grants a certificate of appealability as to that issue.

7   The court declines to issue a certificate of appealability for its resolution of any procedural issues

8   or any of Blake's other habeas claims.

9        **IT IS THEREFORE ORDERED** that Blake's second amended petition for writ of

10   habeas corpus (ECF No. 124) is DENIED.  The Clerk shall enter judgment accordingly and close

11   this case.

12        **IT IS FURTHER ORDERED** that a Certificate of Appealability is granted as to the

13   court's resolution of the following issue:

14             Whether Blake has demonstrated prejudice, under *Strickland*, due
counsel's failure to investigate and present available mitigating evidence.

15

16    DATED: February 9, 2023

17

18

19                        ROBERT C. JONES

20                        UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28